## UNITED STATES ex rel. KNAUFF v. SHAUGH-NESSY, ACTING DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION.

No. 54.   Argued December 5–6, 1949.—Decided January 16, 1950.

*Gunther Jacobson* argued the cause and filed a brief for petitioner.

*Philip R. Monahan* argued the cause for respondent. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell, Joseph W. Bishop, Jr.* and *Robert S. Erdahl.*

*Jack Wasserman* filed a brief for the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE MINTON delivered the opinion of the Court.

May the United States exclude without hearing, solely upon a finding by the Attorney General that her admission would be prejudicial to the interests of the United States, the alien wife of a citizen who had served honorably in the armed forces of the United States during World War II? The District Court for the Southern District of New York held that it could, and the Court of Appeals for the Second Circuit affirmed. 173 F. 2d 599. We granted certiorari to examine the question especially in the light of the War Brides Act of December 28, 1945. 336 U. S. 966.

Petitioner was born in Germany in 1915. She left Germany and went to Czechoslovakia during the Hitler regime. There she was married and divorced. She went to England in 1939 as a refugee. Thereafter she served with the Royal Air Force efficiently and honorably from January 1, 1943, until May 30, 1946. She then secured civilian employment with the War Department of the United States in Germany. Her work was rated "very good" and "excellent." On February 28, 1948, with the permission of the Commanding General at Frankfurt, Germany, she married Kurt W. Knauff, a naturalized citizen of the United States. He is an honorably discharged United States Army veteran of World War II. He is, as he was at the time of his marriage, a civilian employee of the United States Army at Frankfurt, Germany.

On August 14, 1948, petitioner sought to enter the United States to be naturalized. On that day she was temporarily excluded from the United States and detained at Ellis Island. On October 6, 1948, the Assistant Commissioner of Immigration and Naturalization recommended that she be permanently excluded without a hearing on the ground that her admission would be

prejudicial to the interests of the United States. On the same day the Attorney General adopted this recommendation and entered a final order of exclusion. To test the right of the Attorney General to exclude her without a hearing for security reasons, *habeas corpus* proceedings were instituted in the Southern District of New York, based primarily on provisions of the War Brides Act. The District Court dismissed the writ, and the Court of Appeals affirmed.

The authority of the Attorney General to order the exclusion of aliens without a hearing flows from the Act of June 21, 1941, amending § 1 of the Act of May 22, 1918 (55 Stat. 252, 22 U. S. C. § 223).[1] By the 1941 amendment it was provided that the President might, upon finding that the interests of the United States required it, impose additional restrictions and prohibitions on the entry into and departure of persons from the United States during the national emergency proclaimed May 27, 1941. Pursuant to this Act of Congress the President on November 14, 1941, issued Proclamation 2523 (3 CFR, 1943 Cum. Supp., 270–272). This proclamation recited that the interests of the United States required the imposition of additional restrictions upon the entry into and

---

[1] "When the United States is at war or during the existence of the national emergency proclaimed by the President on May 27, 1941, or as to aliens whenever there exists a state of war between, or among, two or more states, and the President shall find that the interests of the United States require that restrictions and prohibitions in addition to those provided otherwise than by this Act be imposed upon the departure of persons from and their entry into the United States, and shall make public proclamation thereof, it shall, until otherwise ordered by the President or Congress, be unlawful—

"(a) For any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe . . . ."

departure of persons from the country and authorized the promulgation of regulations jointly by the Secretary of State and the Attorney General. It was also provided that no alien should be permitted to enter the United States if it were found that such entry would be prejudicial to the interests of the United States.[2]

Pursuant to the authority of this proclamation the Secretary of State and the Attorney General issued regulations governing the entry into and departure of persons from the United States during the national emergency. Subparagraphs (a) to (k) of § 175.53 of these regulations specified the classes of aliens whose entry into the United States was deemed prejudicial to the public interest. Subparagraph (b) of § 175.57 provided that the Attorney General might deny an alien a hearing before a board of inquiry in special cases where he determined that the alien was excludable under the regulations on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest.[3]

---

[2] "(3) After the effective date of the rules and regulations hereinafter authorized, no alien shall enter or attempt to enter the United States unless he is in possession of a valid unexpired permit to enter issued by the Secretary of State, or by an appropriate officer designated by the Secretary of State, or is exempted from obtaining a permit to enter in accordance with the rules and regulations which the Secretary of State, with the concurrence of the Attorney General, is hereby authorized to prescribe in execution of these rules, regulations, and orders.

"No alien shall be permitted to enter the United States if it appears to the satisfaction of the Secretary of State that such entry would be prejudicial to the interests of the United States as provided in the rules and regulations hereinbefore authorized to be prescribed by the Secretary of State, with the concurrence of the Attorney General." 3 CFR, 1943 Cum. Supp., 271.

[3] "In the case of an alien temporarily excluded by an official of the Department of Justice on the ground that he is, or may be, excludable under one or more of the categories set forth in § 175.53, no hearing by a board of special inquiry shall be held until after

It was under this regulation § 175.57 (b) that petitioner was excluded by the Attorney General and denied a hearing. We are asked to pass upon the validity of this action.

At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe. It must be exercised in accordance with the procedure which the United States provides. *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 711.

Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power. But there is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation. *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 713. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

the case is reported to the Attorney General and such a hearing is directed by the Attorney General or his representative. In any special case the alien may be denied a hearing before a board of special inquiry and an appeal from the decision of that board if the Attorney General determines that he is excludable under one of the categories set forth in § 175.53 on the basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest." 8 CFR, 1945 Supp., § 175.57 (b).

Thus the decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General. The action of the executive officer under such authority is final and conclusive. Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien. *Nishimura Ekiu* v. *United States,* 142 U. S. 651, 659–660; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 713–714; *Ludecke* v. *Watkins,* 335 U. S. 160. Cf. *Yamataya* v. *Fisher,* 189 U. S. 86, 101. Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power, *e. g.,* as was done here, for the best interests of the country during a time of national emergency. Executive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent. What was said in *Lichter* v. *United States,* 334 U. S. 742, 785, is equally appropriate here:

> "It is not necessary that Congress supply administrative officials with a specific formula for their guidance in a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program. . . . Standards prescribed by Congress are to be read in the light of the conditions to which they are to be applied. 'They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear.' "

Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned. *Nishimura Ekiu* v. *United States, supra; Ludecke* v. *Watkins, supra.*

In the particular circumstances of the instant case the Attorney General, exercising the discretion entrusted to him by Congress and the President, concluded upon the basis of confidential information that the public interest required that petitioner be denied the privilege of entry into the United States. He denied her a hearing on the matter because, in his judgment, the disclosure of the information on which he based that opinion would itself endanger the public security.

We find no substantial merit to petitioner's contention that the regulations were not "reasonable" as they were required to be by the 1941 Act. We think them reasonable in the circumstances of the period for which they were authorized, namely, the national emergency of World War II. Nor can we agree with petitioner's assertion that Proclamation 2523 (see note 2, *supra*) authorized only the Secretary of State, and not the Attorney General, to order the exclusion of aliens. See Presidential Proclamation 2850 of August 17, 1949 (14 Fed. Reg. 5173), amending and clarifying Proclamation 2523. We reiterate that we are dealing here with a matter of *privilege.* Petitioner had no vested *right* of entry which could be the subject of a prohibition against retroactive operation of regulations affecting her status.

It is not disputed that the Attorney General's action was pursuant to the 8 CFR regulations heretofore discussed.[4] However, 22 U. S. C. § 223,[5] authorizes these special restrictions on the entry of aliens only when the United States is at war or during the existence of the

---

[4] See note 3, *supra.*

[5] See note 1, *supra.*

national emergency proclaimed May 27, 1941.[6] For ordinary times Congress has provided aliens with a hearing. 8 U. S. C. §§ 152, 153. And the contention of petitioner is that she is entitled to the statutory hearing because for purposes of the War Brides Act, within which she comes, the war terminated when the President proclaimed the cessation of hostilities.[7] She contends that the War Brides Act, applicable portions of which are set out in the margin,[8] discloses a congressional intent that special restrictions on the entry of aliens should cease to apply to war brides upon the cessation of hostilities.

The War Brides Act provides that World War II is the period from December 7, 1941, until the proclaimed termination of hostilities. This has nothing to do with the period for which the regulations here acted under were

---

[6] And at certain other times not material here.

[7] Proclamation 2714 of December 31, 1946, 3 CFR, 1946 Supp., 77.

[8] "That notwithstanding any of the several clauses of section 3 of the Act of February 5, 1917, excluding physically and mentally defective aliens, and notwithstanding the documentary requirements of any of the immigration laws or regulations, Executive orders, or Presidential proclamations issued thereunder, alien spouses or alien children of United States citizens serving in, or having an honorable discharge certificate from the armed forces of the United States during the Second World War shall, if otherwise admissible under the immigration laws and if application for admission is made within three years of the effective date of this Act, be admitted to the United States . . . .

"SEC. 2. Regardless of section 9 of the Immigration Act of 1924, any alien admitted under section 1 of this Act shall be deemed to be a nonquota immigrant as defined in section 4 (a) of the Immigration Act of 1924.

.     .     .     .     .

"SEC. 5. For the purpose of this Act, the Second World War shall be deemed to have commenced on December 7, 1941, and to have ceased upon the termination of hostilities as declared by the President or by a joint resolution of Congress." 59 Stat. 659, 8 U. S. C. §§ 232–236.

authorized. The beginning and end of the war are defined by the War Brides Act, we assume, for the purpose of ascertaining the period within which citizens must have served in the armed forces in order for their spouses and children to be entitled to the benefits of the Act. The special procedure followed in this case was authorized not only during the period of actual hostilities but during the entire war and the national emergency proclaimed May 27, 1941. The national emergency has never been terminated. Indeed, a state of war still exists. See *Woods* v. *Miller Co.,* 333 U. S. 138, n. 3. Thus, the authority upon which the Attorney General acted remains in force. The Act of June 21, 1941, and the President's proclamations and the regulations thereunder are still a part of the immigration laws.

The War Brides Act does not relieve petitioner of her alien status. Indeed, she sought admission in order to be naturalized and thus to overcome her alien status. The Act relieved her of certain physical, mental, and documentary requirements and of the quota provisions of the immigration laws. But she must, as the Act requires, still be "otherwise admissible under the immigration laws." In other words, aside from the enumerated relaxations of the immigration laws she must be treated as any other alien seeking admission. Under the immigration laws and regulations applicable to all aliens seeking entry into the United States during the national emergency, she was excluded by the Attorney General without a hearing. In such a case we have no authority to retry the determination of the Attorney General. *Ludecke* v. *Watkins,* 335 U. S. 160, 171–172.

There is nothing in the War Brides Act or its legislative history [9] to indicate that it was the purpose of Congress,

---

[9] See H. R. Rep. No. 1320, 79th Cong., 1st Sess. (1945); S. Rep. No. 860, 79th Cong., 1st Sess. (1945); 91 Cong. Rec. 11738, 12342 (1945).

by partially suspending compliance with certain requirements and the quota provisions of the immigration laws, to relax the security provisions of the immigration laws. There is no indication that Congress intended to permit members or former members of the armed forces to marry and bring into the United States aliens that the President, acting through the Attorney General in the performance of his sworn duty, found should be denied entry for security reasons. As all other aliens, petitioner had to stand the test of security. This she failed to meet. We find no legal defect in the manner of petitioner's exclusion, and the judgment is

*Affirmed.*

MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

If the essence of statutory construction is to find the thought beneath the words, the views expressed by MR. JUSTICE JACKSON, in which I fully concur, enforce the purpose of Congress. The contrary conclusion substantially frustrates it.

Seventy years ago began the policy of excluding mentally defective aliens from admission into the United States. Thirty years ago it became our settled policy to admit even the most desirable aliens only in accordance with the quota system. By the so-called War Brides Act Congress made inroads upon both these deeply-rooted policies. (Act of December 28, 1945, 59 Stat. 659, 8 U. S. C. § 232 *et seq.*) It lifted the bar against the exclusion even of "physically and mentally defective aliens." It did this in favor of "alien spouses and alien minor children of citizen members who are serving or have served honorably in the armed forces of the United States during World War II." H. R. Rep. No. 1320 and S. Rep. No. 860, 79th Cong., 1st Sess. (1945).

548

This was a bounty afforded by Congress not to the alien who had become the wife of an American but to the citizen who had honorably served his country. Congress gave this bounty even though a physically or mentally defective person might thereby be added to the population of the United States. Yet it is suggested that the deepest tie that an American soldier could form may be secretly severed on the mere say-so of an official, however well-intentioned. Although five minutes of cross-examination could enable the soldier-husband to dissipate seemingly convincing information affecting the security danger of his wife, that opportunity need not be accorded. And all this, because of the literal reading of the provision of the War Brides Act that the alien spouse, though physically and mentally defective, is to be allowed to join her citizen husband "if otherwise admissible under the immigration laws." Upon that phrase is rested the whole structure of Executive regulation based on § 1 of the Act of May 22, 1918, 40 Stat. 559, as amended by the Act of June 21, 1941, 55 Stat. 252, 22 U. S. C. § 223, regarding the summary exclusion, without opportunity for a hearing, of an alien whose entry the Attorney General finds inimical to the public interest.*

This is not the way to read such legislation. It is true also of Acts of Congress that "The letter killeth." Legislation should not be read in such a decimating spirit unless the letter of Congress is inexorable. We are reminded from time to time that in enacting legislation Congress is not engaged in a scientific process which takes account of every contingency. Its laws are not to be read as though every *i* has to be dotted and every *t*

*The Attorney General is to act on information that satisfies him; not only is there no opportunity for a hearing, but the Attorney General can lock in his own bosom the evidence that does satisfy him. 8 C. F. R. §§ 175.53, 175.57 (1949).

crossed. The War Brides Act is legislation derived from the dominant regard which American society places upon the family. It is not to be assumed that Congress gave with a bountiful hand but allowed its bounty arbitrarily to be taken away. In framing and passing the War Brides Act, Congress was preoccupied with opening the door to wives acquired by American husbands during service in foreign lands. It opened the door on essentials—wives of American soldiers and perchance mothers of their children were not to run the gauntlet of administrative discretion in determining their physical and mental condition, and were to be deemed nonquota immigrants. Congress ought not to be made to appear to require that they incur the greater hazards of an informer's tale without any opportunity for its refutation, especially since considerations of national security, insofar as they are pertinent, can be amply protected by a hearing *in camera*. Compare Rule 46 of the Rules of Practice for Admiralty Courts during World War II, 316 U. S. 717; 328 U. S. 882, and see Haydock, *Some Evidentiary Problems Posed by Atomic Energy Security Requirements*, 61 Harv. L. Rev. 468, 482–83 (1948). An alien's opportunity of entry into the United States is of course a privilege which Congress may grant or withhold. But the crux of the problem before us is whether Congress, having extended the privilege for the benefit not of the alien but of her American husband, left wide open the opportunity ruthlessly to take away what it gave.

A regulation permitting such exclusion by the Attorney General's fiat—in the nature of things that high functionary must largely act on dossiers prepared by others—in the case of an alien claiming entry on his own account is one thing. To construe such regulation to be authorized and to apply in the case of the wife of an honorably

discharged American soldier is quite another thing. Had Congress spoken explicitly we would have to bow to it. Such a substantial contradiction of the congressional beneficence which is at the heart of the War Brides Act ought not to be attributed to Congress by a process of elaborate implication. Especially is this to be avoided when to do so charges Congress with an obviously harsh purpose. Due regard for the whole body of immigration laws and policies makes it singularly appropriate in construing the War Brides Act to be heedful of the admonition that "The letter killeth."

MR. JUSTICE JACKSON, whom MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER join, dissenting.

I do not question the constitutional power of Congress to authorize immigration authorities to turn back from our gates any alien or class of aliens. But I do not find that Congress has authorized an abrupt and brutal exclusion of the wife of an American citizen without a hearing.

Congress held out a promise of liberalized admission to alien brides, taken unto themselves by men serving in or honorably discharged from our armed services abroad, as the Act, set forth in the Court's opinion, indicates. The petitioning husband is honorably discharged and remained in Germany as a civilian employee. Our military authorities abroad required their permission before marriage. The Army in Germany is not without a vigilant and security-conscious intelligence service. This woman was employed by our European Command and her record is not only without blemish, but is highly praised by her superiors. The marriage of this alien woman to this veteran was approved by the Commanding General at Frankfurt-on-Main.

Now this American citizen is told he cannot bring his wife to the United States, but he will not be told why.

He must abandon his bride to live in his own country or forsake his country to live with his bride.

So he went to court and sought a writ of *habeas corpus,* which we never tire of citing to Europe as the unanswerable evidence that our free country permits no arbitrary official detention. And the Government tells the Court that not even a court can find out why the girl is excluded. But it says we must find that Congress authorized this treatment of war brides and, even if we cannot get any reasons for it, we must say it is legal; security requires it.

Security is like liberty in that many are the crimes committed in its name. The menace to the security of this country, be it great as it may, from this girl's admission is as nothing compared to the menace to free institutions inherent in procedures of this pattern. In the name of security the police state justifies its arbitrary oppressions on evidence that is secret, because security might be prejudiced if it were brought to light in hearings. The plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of informer undetected and uncorrected. *Cf. In re Oliver,* 333 U. S. 257, 268.

I am sure the officials here have acted from a sense of duty, with full belief in their lawful power, and no doubt upon information which, if it stood the test of trial, would justify the order of exclusion. But not even they know whether it would stand this test. And anyway, as I have said before, personal confidence in the officials involved does not excuse a judge for sanctioning a procedure that is dangerously wrong in principle. Dissent in *Bowles* v. *United States,* 319 U. S. 33, 37.

Congress will have to use more explicit language than any yet cited before I will agree that it has authorized an administrative officer to break up the family of an

American citizen or force him to keep his wife by becoming an exile. Likewise, it will have to be much more explicit before I can agree that it authorized a finding of serious misconduct against the wife of an American citizen without notice of charges, evidence of guilt and a chance to meet it.

I should direct the Attorney General either to produce his evidence justifying exclusion or to admit Mrs. Knauff to the country.