April 11, 1977

## 77-20 MEMORANDUM OPINION FOR THE COMMISSIONER OF IMMIGRATION AND NATURALIZATION

### Section 212(a)(27) of the Immigration and Nationality Act—Exclusion of Certain Aliens—Rhodesia

This is in response to your request for our opinion concerning the scope of Section 212(a)(27) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(27). That provision makes ineligible for visas and excludes from admission into the United States:

> Aliens who the consular officer or the Attorney General knows or has reason to believe seek to enter the United States solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States.

In the fall of 1975, six Southern Rhodesian aliens sought to enter the United States to attend a conference of the International Federation of Agricultural Producers in Washington, D.C. The six apparently would have been traveling on British passports. The Department of State identified the six aliens as officials of the National Farmers' Union of Southern Rhodesia, an organization of private farmers that seeks to promote export sales of agricultural commodities grown in Southern Rhodesia and cooperates closely with the existing government of that country. The Department of State determined that, in attending the meeting of the International Federation of Agricultural Producers, the aliens would have sought to promote the foreign sale of agricultural commodities grown in Southern Rhodesia. We understand that the six Rhodesian aliens were excluded from the United States under Section 212(a)(27) on the basis of the State Department's determination.

The legal validity of the exclusion was subsequently questioned by a Member of Congress, who took the position that Section 212(a)(27) applies only to subversives. Because of renewed interest in the scope of Section 212(a)(27) and the continuing existence of United Nations sanc-

tions against Southern Rhodesia, we believe it is useful to convey our opinion on the subject at this time and to do so with some reference to the Rhodesian situation.

It is our opinion that potentially serious adverse foreign policy consequences may properly be taken into account in determining whether an alien is ineligible for a visa and hence inadmissible into the United States. We therefore agree that given the findings of the Department of State, the aliens who sought to attend the conference in 1975 were inadmissible under Section 212(a)(27). We also are of the opinion that otherwise innocuous activities in the United States may give rise to inadmissibility under that provision in certain circumstances.

I

As we understand the policies and practices of the National Farmers' Union, the entry of officials of that organization into the United States to attend the conference and their activities at the conference would have violated sections 3(b) and 5(b) of the United Nations Security Council Resolution 253 of May 29, 1968. Section 3(b) thereof provides that Member States "shall prevent . . . [a]ny activities by their nationals or in their territories which would promote or are calculated to promote the export of any commodities or products from Southern Rhodesia . . . ." Section 5(b) directs Member States to "[t]ake all possible measures to prevent the entry into their territories of persons whom they have reason to believe to be ordinarily resident in Southern Rhodesia and whom they have reason to believe to have furthered or encouraged, or to be likely to further or encourage, the unlawful actions of the illegal regime in Southern Rhodesia . . . ." [1]

Congress has authorized the President to issue orders, rules, and regulations to provide for the domestic enforcement of United Nations sanctions, and has established criminal penalties for persons subject to the jurisdiction of the United States who violate such orders, rules, and regulations. *See* 22 U.S.C. § 287c. Section 1(b) of Executive Order No. 11419, 3 CFR 737 (1966–1970 Compilation), which was issued to implement Security Council Resolution 253, prohibits any person subject to the jurisdiction of the United States from engaging in activities that would promote the export of any commodities or products originating in Southern Rhodesia. Thus, the representatives of the National Farmers' Union would have committed a criminal offense if, as the Depart-

---

[1] Section 5(a) of Resolution 253 directs all Member States to prevent the entry into their territories, save on exceptional humanitarian grounds, of any person traveling on a Southern Rhodesian passport. Section 5(a) is not implicated in the present situation because the Rhodesian nationals were traveling on British passports. We have been informed that it has been the policy of the Department of State from the beginning that the regime does not constitute "competent authority" for the issuance of passports within the meaning of § 101(a)(30) of the Immigration and Nationality Act, and that travel documents issued by the regime therefore do not meet the requirements for entry contained in § 101(a)(26). As a result, there is no need to rely on § 212(a)(27) in excluding aliens traveling on Rhodesian passports.

ment of State predicted, they had sought to promote the export of Rhodesian agricultural products while they were attending the conference. It would seem that activities that are prohibited by a Security Council Resolution, an Executive order issued to conform this Nation's foreign policy to that Resolution, and a criminal statute designed to enforce such Executive orders, must surely be regarded as "activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States" within the meaning of Section 212(a)(27). But we do not believe that the Resolution, the Executive order, and the attendant criminal sanctions are essential to our conclusion that the Rhodesian nationals were properly excluded under Section 212(a)(27).

Executive Order No. 11419 does not speak directly to the requirement in Security Council Resolution 253 that Member States prevent the entry of Rhodesian residents who there is reason to believe have furthered or encouraged or would be likely to further or encourage "the unlawful actions" of the present regime in Southern Rhodesia. This omission from the Executive order was deliberate. The Department of State and this Department took the position that no additional authorization was needed in order to implement this aspect of the Security Council Resolution because the Rhodesian aliens in question would be excluded from entry under the Immigration and Nationality Act. A memorandum prepared by this Office in 1968 and forwarded to the White House with the proposed order stated:

> Certain other requirements of the Security Council Resolution have been omitted from the proposed order on the basis that they can be put into effect on the part of the United States by the responsible agencies under existing authority. Thus, the requirements to exclude from Member States persons traveling on Rhodesian passports[2] and to "take all possible measures" to exclude certain persons ordinarily residing in Southern Rhodesia are to be implemented by the Departments of State and Justice in accordance with the Immigration and Nationality Act.

The letter of transmittal from the Justice Department's Office of Legal Counsel to the President was to the same effect.[3] Therefore, this Department, the Department of State, and the President fully expected that the Immigration and Nationality Act would, of its own force, prevent the entry of Rhodesian aliens who might engage in activities in this country that would further and encourage the unlawful actions of the regime in Southern Rhodesia and thereby adversely affect the

---

[2] *See* footnote 1.

[3] The function of reviewing Executive orders as to form and legality has been delegated by the Attorney General to the Office of Legal Counsel. 28 CFR § 0.25(b).

Nation's foreign relations.[4] Section 212(a)(27) was not specifically mentioned in the various letters and memorandums written in 1968, but its grounds for exclusion are the only ones contained in Section 212(a)(27) that could have been thought to be applicable to the Rhodesian situation.

The conclusion reached by the Administration in 1968 finds support in the text of Section 212(a)(27), its legislative history, and administrative interpretation. Its language is clearly not limited in its application to aliens posing a threat to internal security, as has been suggested. Activities by aliens that could have potentially serious adverse effects on the Nation's foreign policy can quite reasonably be characterized either as "prejudicial to the public interest" or likely to "endanger the . . . security of the United States" within the meaning of the provision.[5]

It is true that the elements of legislative history relating directly to the passage of the Immigration and Nationality Act in 1952 can be read as limiting application of Section 212(a)(27) to internal security cases. For example, the House and Senate reports describe the provision in identical language, indicating that it and subparagraphs (28) and (29) merely "incorporate the provisions of Section 1 of the Act of October 16, 1918, as amended by Section 22 of the Subversive Activities Control Act of 1950, 64 Stat. 987, relating to the exclusion of subversives." S. Rep. No. 1137, 82d Cong., 2d Sess. 10 (1952); H. Rep. No. 1365, 82d Cong., 2d Sess. 49 (1952). However, because the language of Section 212(a)(27) was taken almost verbatim from § 22 of the Subversive Activities Control Act of 1950, 64 Stat. 987, 1006,[6] it is necessary to consult as well the legislative history of that earlier Act, which clearly sustains the current position of the Service and the State Department.

While Congress' immediate focus in creating additional categories of excludable aliens in 1950 was also directed to persons who could be characterized as "subversives," *see, e.g.,* S. Rep. No. 2230, 81st Cong.,

---

[4] It would seem from the account in the text that in 1968 the Administration was also of the view that § 212(a)(27) would operate to bar the admission of aliens who had in the past furthered or encouraged the actions of the illegal regime in Southern Rhodesia, regardless of the nature of the specific activities in which they proposed to engage while in the country. We believe that there is considerable support for this view, *see* Part II, *infra,* but there was no need to rely upon it in excluding the aliens in view of the specific activities in which they intended to engage after entering the country.

[5] The term "national security" is often used to include considerations of both national defense and foreign policy. *See, e.g.,* Executive Order No. 11652, § 1, 3 CFR §§ 678, 679 (1971–1975 Compilation). The phrase "security of the United States" may be construed in a similar fashion.

[6] The only difference between the two provisions is that the relevant portion of § 22 of the 1950 Act did not contain the reference in Section 212(a)(27) to the "security" of the United States.

2d Sess. 16–28 (1950),[7] § 22 of the Subversive Activities Control Act of 1950 as passed swept much more broadly. Congress' choice of language is instructive, particularly its use of the phrase "prejudicial to the public interest." That phrase had a well-settled administrative interpretation in 1950. Under the Act of May 22, 1918, 40 Stat. 559, as amended by the Act of June 21, 1941, 55 Stat. 252, the President was authorized to impose additional restrictions on the entry of persons into the United States during times of war or national emergency. In Proclamation 2523, 3 CFR 270 (1938–1943 Compilation), issued November 14, 1941, the President found such additional restrictions to be necessary and declared that an alien would not be permitted to enter if his entry would be "prejudicial to the interests of the United States," as provided in regulations to be promulgated by the Secretary of State in consultation with the Attorney General. Under the regulations that were promulgated, no entry permit could be issued to any alien "if the permit-issuing authority [had] reason to believe that the entry of the alien would be prejudicial to the interests of the United States." 8 CFR § 175.52(a) (1949 ed.) *See, generally, Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–41 (1950); *Shaughnessy* v. *Mezei,* 345 U.S. 206, 210–11, and n. 7 (1953). The 1949 Aliens and Nationality regulations then listed 11 categories of inadmissible aliens, one of which categories is highly relevant here:

§ 175.53 *Classes of aliens whose entry is deemed to be prejudicial to the public interest.* The entry of an alien who is within one of the following categories shall be deemed to be prejudicial to the interests of the United States . . .

☆ ☆ ☆ ☆ ☆ ☆ ☆

(b) Any alien who is a member of, affiliated with, or may be active in the United States in connection with or on behalf of, a political organization associated with or carrying out policies of any foreign government opposed to the measures adopted by the Government of the United States in the public interest, or in the interest of national defense, or in the interest of the common defense of the countries of the Western Hemisphere, or in the prosecution of the war.

The proclamation and regulations were still in effect in 1950. *Knauff* v. *Shaughnessy, supra,* 338 U.S. at 546. Thus, when the predecessor to Section 212(a)(27) was adopted, aliens who were expected to be active in the United States on behalf of organizations that supported countries having foreign policy conflicts with the United States, were included among those who were inadmissible on the ground that their entry

---

[7] That report recommended passage of S. 1832, which was limited in purpose to amending the Act of October 16, 1918, to provide, *inter alia,* for the exclusion of those connected with Communist organizations. The substance of S. 1832 was added by the Senate to the House-passed version of the Subversive Activities Control Act of 1950, and the House later agreed to the addition. *See* H. Rep. No. 3112, 81st Cong., 2d Sess., at 54 (1950).

68

would be "prejudicial to the public interest" or "prejudicial to the interests of the United States."

The prohibition in Section 212(a)(27) against the entry of aliens who there is reason to believe would engage in activities that would be "prejudicial to the public interest" appears to be a direct descendant of the Presidential proclamation and regulations. "The chief difference . . . is that the operation of this new legislation is not limited to time of war or national emergency. Its inhibitions must be enforced at all times as part of our permanent legislative pattern." C. Gordon, "The Immigration Process and National Security," 24 Temp. L.Q. 302, 306 (1951).

The Senate Report that first proposed what later became § 22 of the Subversive Activities Control Act of 1950 (the predecessor of Section 212(a)(27)), discussed Proclamation 2523 and 8 CFR § 175.53 as part of the body of immigration law on which Congress was building. S. Rep. No. 2230, 81st Cong., 2d Sess. 22 (1950). The report did not expressly refer to subsection (b), quoted above, or any other subsection of 8 CFR 175.53. But neither did it express disapproval of the broad sweep of immigration law then in effect, of which the regulations were a part, or indicate an intention to narrow them. The tenor of the legislative history is precisely to the contrary.[8]

Against this background, it is entirely reasonable to infer that, in enacting Section 212(a)(27), Congress contemplated that foreign policy considerations could play a role in determining whether an alien's activities in the United States would be "prejudicial to the public interest."[9]

---

[8] For example, two Senate reports recommending the amendment finally enacted in § 22 of the Subversive Activities Control Act of 1950 described the provision as follows:
Section 1(1) of the Act of October 16, 1918, as amended by the bill, is an admixture of existing law and the new provisions of the bill. Under existing law, among the excludable aliens are certain aliens who seek to enter the United States whose entry would be prejudicial to the public interest or would endanger the safety of the United States. The committee has broadened this class of excludable aliens to include those aliens who seek to enter the United States to engage in activities which would endanger the welfare of the Unites States.
S. Rep. No. 2230, 81st Cong., 2d Sess. 5 (1950); S. Rep. No. 2369, 81st Cong., 2d Sess. 10 (1950).
Then-existing *statutory* law only prohibited the entry of aliens who there was reason to believe would engage in activities that would endanger the safety of the United States. *See* S. Rep. No. 2230, *supra*, at 28. The reference in the Senate report to the prohibition "[u]nder existing law" against entries that would be "prejudicial to the public interest" must therefore have been to Proclamation 2523 and 8 CFR § 175.53. The passages from the Senate reports express a purpose to retain and codify the substance of these nonstatutory restrictions.

[9] The Immigration and Naturalization Service analysis of § 212(a)(27), when the Immigration and Nationality Act of 1952 was still in its draft stage, informed the Congress that provisions similar to § 212(a)(27) already appeared in the Act of May 22, 1918 as amended, and Proclamation 2523. U.S. Immigration and Naturalization Service, Report on S. 716, A Bill to Revise the Laws Relating to Immigration, Naturalization and Nationality, at p. 212-24. The Service did not mention the regulations in its analysis, but the reference to the proclamation supports the conclusion that § 212(a)(27) may be interpreted in light of the grounds for exclusion specified in the regulations implementing the proclamation.

The administrative interpretation by the Departments of State and Justice has been consistent with this reading of the legislative history. We are informed that over a number of years, the Department of State has applied Section 212(a)(27) in two different types of cases: Cases involving a security threat in the narrow sense, such as the entry of saboteurs or persons involved in intelligence missions against the United States, and cases involving potentially far-reaching adverse effects on United States foreign policy. Exclusion of the Rhodesian aliens was therefore in keeping with the latter aspect of the State Department's previous application of the section.

The interpretation by the Board of Immigration Appeals is not to the contrary. For example, in *Matter of M–,* 5 I&N Dec. 248, 252 (1953), the Board stated:

> The Senate and House Committees which recommended the passage of the bill . . . considered the section as one relating to subversives (p. 10, S. Rept. No. 1137, 82d Cong., 2d Sess.; p. 49, H. Rep. No. 1365, 82d Cong., 2d Sess.). *However it is clear that the language of the section is broad enough to include others than subversives.* [Emphasis added.]

*See also, Matter of McDonald and Brewster,* Int. Dec. #2353 (March 13, 1975), at pp. 3–4. No doubt it was with such an interpretation of Section 212(a)(27) in mind that the Departments of State and Justice concluded in 1968 that Rhodesian aliens who would be likely to further or encourage the unlawful regime in Southern Rhodesia, could be excluded under the Immigration and Nationality Act without additional authorization in Executive Order No. 11419.

It is our opinion that the language of Section 212(a)(27), its legislative history, and administrative interpretation all support your conclusion that the six aliens who sought to attend an agricultural conference in the United States were inadmissible under that section.

II

A question has arisen in the course of our review of Section 212(a)(27) as to whether that provision would operate to exclude an alien whose mere entry into or presence in the United States would be "prejudicial to the public interest" or "endanger the . . . security of the United States," perhaps for foreign policy reasons. As mentioned in footnote 4, the Administration in 1968 apparently assumed that to be the case in choosing to rely on Section 212(a)(27) to prevent the entry of Rhodesian aliens who had in the past furthered or encouraged the unlawful actions of the illegal regime in Southern Rhodesia. *See* Security Council Resolution 253, § 5(b). The exclusion of such aliens presumably was intended to be predicated not on the nature of any specific activities in which they would engage while here, but on the serious adverse foreign policy consequences of allowing them to be present in violation of Security Council Resolution 253. We believe that the

conclusion reached in 1968 was based on a reasonable administrative interpretation of Section 212(a)(27).

It is true that Section 212(a)(27) does not expressly provide that an alien whose *entry* would be prejudicial to the public interest or endanger national security is inadmissible; it speaks instead of the nature of the activities in which the alien seeks to engage after entering the United States. Nevertheless, we believe that the circumstances surrounding the alien's entry are in some cases quite relevant to the assessment of the foreign relations impact of the alien's subsequent activities in this country.

Whether or not an alien is inadmissible under Section 212(a)(27) depends on all the facts and circumstances, including foreign policy factors over which the individual alien may have no control. Thus, activities that might be wholly innocuous if engaged in by one alien, might fairly be regarded as "prejudicial to the public interest" if engaged in by another, even if the individual alien did not have a specific intent to cause any harm or disturbance while in the United States.

Section 5(b) of Security Council Resolution 253, to which this country is committed, imposes a duty on Member States to prohibit the entry *for any purpose* of all Rhodesian aliens who have furthered or encouraged the unlawful actions of the Rhodesian regime. As a result, *all* of the activities of such persons in the United States, however harmless they would be if engaged in by other aliens, might have serious foreign policy consequences simply because the Rhodesians would have entered the country in violation of the resolution.[10] As a practical matter, then, Rhodesian aliens covered by the Security Council Resolution are inadmissible because their entry or presence in the United States would be prejudicial to the public interest or endanger national security, even though the language of the statute speaks in terms of activities of aliens in the United States.[11]

The legislative history supports this interpretation of the statute. For example, the Presidential proclamation and regulations on which Section 212(a)(27) was based were written in terms of an alien whose *entry* would be prejudicial to the United States or to the public interest, *see,* Proclamation 2523, *supra;* 8 CFR § 175.52(a) and 175.53 (1949), *supra,* as did the two Senate Reports that first proposed the provision in 1950.

---

[10] Alternatively, Rhodesian aliens required to be excluded under the Security Council Resolution could be considered to be inadmissible under § 212(a)(27) on the ground that their *presence* in the United States would be an "activity" that would be prejudicial to the public interest or endanger the national security.

[11] An argument against the interpretation we have advanced in the text has been suggested, based on the hypothetical example of a military dictator, a presumed *persona non grata* in this country, who might wish to enter the United States to visit his dying mother or to receive medical attention. We agree that § 212(a)(27) would ordinarily not prevent such an entry. But we reach that conclusion on the ground that such otherwise harmless activities in this country would not usually cause a foreign policy embarrassment of sufficient magnitude to be regarded as prejudicial to the public interest simply because a military dictator was involved, not because § 212(a)(27) is wholly inapplicable in such a setting

*See* footnote 8. In fact, 8 CFR § 175.53(b), quoted earlier, provided that an entry would be regarded as prejudicial to the public interest if the alien "is a member of, affiliated with, *or* may be active in the United States in connection with or on behalf of, a political organization associated with or carrying out policies of any foreign government opposed to the measures adopted by the Government of the United States in the public interest . . .". [Emphasis added.] This phrase would have barred the members of the National Farmers' Union of Southern Rhodesia, as the Department of State has described that organization, regardless of the nature of their intended activities in the United States.

The Department of State has suggested that some memorandums and correspondence from 1959 to 1962 relating to the efforts of a certain alien to enter the United States may demonstrate an administrative interpretation that an alien could not be excluded solely on the ground that the circumstances surrounding his or her entry render all subsequent activities "prejudicial to the public interest" or a danger to the security of the United States. We do not believe that memorandums and correspondence in question furnish a sound basis for rejecting our interpretation of the statute.

Some of the materials do indicate that an alien may not be excluded under Section 212(a)(27) solely on the ground that his native country has stated that it would regard his admission as an unfriendly act. Several letters also state that the foreign reaction to an alien's entry is not "directly pertinent" to his eligibility for a visa. But despite these statements, both factors appear to have played a decisive role in the State Department's handling of cases over the years. Moreover, while the emphasis was on the particular alien's intended activities in the United States, a number of the memorandums and letters state that it was the State Department's view that the individual's "entry," "admission," or "coming" to the United States would be prejudicial to the public interest, thereby suggesting that it is permissible to consider the ramifications of the entry itself. Because of these inconsistencies, we decline to rely on the materials made available to us by the Department of State as establishing an administrative interpretation that an alien cannot be excluded on the ground that his entry or mere presence would be prejudicial to the public interest or endanger the security of the United States.

The Service has informed us that it has nothing in its files, other than published opinions of the Board of Immigration Appeals, that might shed light on whether an alien may be excluded under Section 212(a)(27) on the ground that his entry or presence in the United States would be prejudicial to the public interest. We have reviewed the published opinions that discuss Section 212(a)(27), including those already cited, but we do not find them to be expecially illuminating on the precise question presented here. All involved charges that the alien would engage in specific activities after entering the United States that

would be prejudicial to the public interest; there was thus no need to discuss the foreign policy consequences of the alien's mere entry or presence.[12]

We agree with what we understand to be the position of the Department of State that under our analysis, only circumstances of an unusual nature could permit a determination that the entry of an alien into the United States would have such serious adverse foreign policy consequences that his mere presence and otherwise innocuous activities in this country would be prejudicial to the public interest or endanger national security.[13] But in our view, the entry of Rhodesian aliens who have furthered or encouraged the "unlawful activities" of the Rhodesian government presents such a case. It is our opinion now, as it was in 1968, that Section 212(a)(27) bars their entry.

We also agree with your conclusion that whether an alien is barred by Section 212(a)(27) should be determined on a case-by-case basis. When a Southern Rhodesian alien is involved, it will be necessary to examine the nature of his intended activities in the United States—as in the case of the six members of the National Farmers' Union who were expected to promote export sales of agricultural commodities grown in

---

[12] For example, in *Matter of M-,* 8 I&N Dec 24 (1958), the Board held that a 73-year-old former Rumanian industrialist, who had previously lived in the United States for 11 years without incident but who was alleged to have been a Nazi sympathizer and Communist sympathizer in Rumania before coming to the United States, was not inadmissible under § 212(a)(27). There was no suggestion, as there has been here, that the alien's mere entry or presence in the United States might have had serious adverse foreign policy consequences. The Board did appear to be of the view that his expected activities after reentering the United States would be determinative, *id.* at 29–30, but it nevertheless undertook an exhaustive review of the alien's past affiliations and activities before concluding that he was admissible. And the Board was especially influenced by a determination in a prior proceeding in 1951 that the alien "was not within the classes of aliens specified in former 8 CFR § 175 53, that is, aliens whose *entry* would be deemed to be prejudicial to the *interests* of the United States." *Id.* at 30. [Emphasis added.]

[13] See the following portion of a letter dated January 14, 1977, from the Administrator of the Bureau of Security and Consular Affairs, to this Office:

When an alien's activities are in and of themselves entirely innocuous—for example, spending a few days or weeks of private relaxation at a resort area—it would then be necessary to demonstrate that the alien's background, notoriety, our government's policies, attitudes and commitments, and other factors were such that the spectacle of the alien's being given permission by the United States Government to engage in such otherwise innocuous activities would or reasonably could be considered to be prejudicial to the public interest or to endanger the safety or security of the United States. It would be the Department's view that such a situation would necessarily involve circumstances of an unusual nature.

Southern Rhodesia when they attended a conference in the United States—or to determine whether the particular individual had in the past furthered and encouraged the "unlawful actions" of the regime to some significant degree.[14]

JOHN M. HARMON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[14] Not all Southern Rhodesians covered by Security Council Resolution 253 are inadmissible under § 212(a)(27) on the ground that their mere presence in the United States is an activity prejudicial to the public interest. Aliens traveling on Rhodesian passports, *see* Resolution § 5(a), are inadmissible under § 212(a)(27) of the Act. *See* note 1, *supra*.