724 F.Supp. 945 (1989)
Orlando Bosch AVILA, Petitioner,
v.
Perry RIVKIND, et al., Respondents.
No. 89-1131-Civ.
United States District Court, S.D. Florida.
November 8, 1989.
Henry N. Adorno and Raoul G. Cantero, Miami, Fla., and Oscar Levin, New York City, for petitioner.
Jack Penca, Buffalo, N.Y., Stuart Schiffer, Washington, D.C., and Steven R. Valentine, *946 Robert L. Bombaugh, Lauri Steven Filppu, and Karen L. Fletcher, Washington, D.C., for respondents.

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
HOEVELER, District Judge.
This order concludes another chapter in the sad odyssey of Orlando Bosch Avila. Once a hero of Cuban resistance to Castro's Communist takeover, his efforts became sullied by his extremes and eventually resulted in his imprisonment and the deterioration of his organizations. His activities and decline have been bittersweet for many in this community who applaud any meaningful resistance to the Dictator Castro, and yet, who cannot approve of terrorism for any purpose.
Petitioner filed this Amended Writ of Habeas Corpus to challenge the Acting Associate Attorney General's Final Order of Exclusion, denying his application for asylum, withholding of deportation, and ordering him excluded from the United States. That order reversed the conclusion of the Regional Commissioner of the Immigration and Naturalization Service ("INS") that Mr. Bosch was not excludable under § 212(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a)(27), or (29), as he no longer presented a security risk to the United States.
Petitioner is a sixty-two year old Cuban physician, born in Cuba in 1926. He was admitted to the United States as a nonimmigrant visitor in 1958, and again in 1960. He has a number of relatives and friends who reside in Dade County, Florida, many of whom are United States citizens.
Mr. Bosch has a history of involvement with radical anti-Communist movements aimed at overthrowing the Cuban government of Fidel Castro, by violent means. In November, 1968 Bosch was convicted by a jury on a five-count indictment for criminal offenses associated with placing explosives on vessels of foreign registry in the Port of Miami, and firing a 57 mm "recoiless" rifle at a Polish vessel docked in Miami. He also telegraphed threats to Mexican, Spanish and British heads of state to destroy ships and planes of their registry. These countries all conducted trade with Cuba at the time. Mr. Bosch received a ten year sentence, and was paroled in 1972, after serving four years in prison. He later violated the terms of his parole by leaving the country in April, 1974. The United States then issued a warrant for his arrest. Bosch resided in Central and South America for about two years, where he led an anti-Castro organization known as CORU. He was arrested in Venezuela in 1976 and charged with conspiracy to bomb a Cuban airliner. Bosch spent the next eleven years in a Venezuelan prison. Upon his release, Bosch applied for a visa to the United States, and received no response from the State Department. On February 16, 1988, he boarded a plane bound for the United States without entry papers, and was arrested upon arrival at Miami International Airport on the outstanding warrant. He was taken to the federal Metropolitan Correctional Center in Miami.
After Bosch served a three month sentence for violating the terms of his parole, the Parole Commission released Bosch from the custody of the Department of Corrections into the custody of INS. He was returned to the custody of INS on May 16, 1988. At this time, Bosch was issued a notice of temporary exclusion pursuant to 8 U.S.C. § 1225(c), on the basis that he posed a threat to national security under 8 U.S.C. § 1182(a), subsections (27), (28) and (29). The case then went to the INS Regional Commissioner, as prescribed by the regulations, who considered it for over a year. On May 19, 1989, the Regional Commissioner concluded that Bosch was not excludable under subsection (27) or (29), and that he did not present a danger to the United States. Pursuant to 8 C.F.R. § 103.4, the Regional Commissioner certified his decision to the INS Commissioner, who affirmed the decision that same day. These were not the first findings that Petitioner was not a security risk. See, Bosch v. Horgan, Case No. 88-318-Civ. (S.D.Fla. 1988). On May 21, 1989, the Attorney General ordered the case transferred to his office for further review. On June 23, *947 1989, Acting Associate Attorney General ("AAAG") Joe Whitley issued a Final Order of Exclusion, ordering Bosch excluded from the United States and recommending deportation, on the basis of the record in this cause, which included classified confidential, as well as non-confidential information. That order concluded that Bosch was a security risk under subsections (27), (28) and (29) of 8 U.S.C. § 1182(a), and reversed the decision of the Regional Commissioner.
The question of whether the Associate Attorney General acting for, and at the direction of the Attorney General, acted within his authority in issuing a Final Order of Exclusion is presently before this Court on Bosch's petition for Writ of Habeas Corpus. This Court heard the arguments of counsel at length on October 5, 1989.
This case presents issues of law and fact which bring into question the extent of an unadmitted alien's rights to procedural and substantive due process under applicable law. The following question is posed to this Court: Does the Attorney General retain the power to summarily exclude an alien where the decision is based upon considerations of national securityspecifically, whether the alien poses a danger to national security under 8 U.S.C. § 1182(a), subsections (27), (28) and (29)notwithstanding the fact that preliminary procedures established by the Attorney General resulted in a finding that the alien was not a security risk?

I.
There is a marked conceptual difference between an exclusion proceeding and a deportation proceeding. The purpose of the former is to determine the admissibility of an alien seeking to enter the United Statesknocking at the door, so to speak. Such an alien carries the burden of establishing his admissibility, and can assert no absolute substantive constitutional right. This is not to say, however, that the unadmitted alien is not entitled to the process which is afforded such by statute or regulation. The law places an alien subject to deportation in a different posture. An alien who has gained entry can only be expelled through deportation proceedings in which the government bears the burden of proof. Such an alien is shielded by the constitutional mandate of procedural due process, and must be afforded a fair hearing.
Through the years, the courts have limited the process afforded excludable aliens to whatever procedures Congress establishes.[1] In the case of excludable aliens who may pose a threat to national security, Congress has permitted the Attorney General to exclude an alien summarily on the basis of confidential information. 8 U.S.C. § 1225(c). Although this curtailment of the fair hearing requirement has been severely criticized,[2] the Mezei doctrine controls.[3]

II.
The power to admit or exclude aliens is a sovereign perogative. An alien seeking admission to the United States is requesting a privilege, and has extremely limited constitutional protection. Landon v. Plesencia, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). Admission of aliens to the United States is a privilege granted by the sovereign United States, *948 only upon such terms as it prescribes. An alien may not seek admission to this country under a claim of right. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). The role of a court in reviewing an order of summary exclusion is limited to ascertaining that the subject of the order is an alien, and that the alien has been summarily excluded under the procedures authorized by Congress. Id. at 544, 70 S.Ct. at 313.
In Shaughnessy v. Mezei, the Supreme Court considered whether the Attorney General acted properly in permanently and summarily (i.e. without a hearing) excluding an alien on the basis of confidential information, and upon finding that the alien's entry would be prejudicial to the public interest for security reasons. The alien challenged his exclusion with a petition for habeas corpus. The Supreme Court found that under 22 U.S.C. § 223 (a statute authorizing the President to impose additional restrictions on the entry of aliens during periods of international tension and strife), the Attorney General properly excluded the alien. The Court cited Knauff v. Shaughnessy, for the proposition that as far as an alien denied entry is concerned, "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government." 345 U.S. at 212, 73 S.Ct. at 629. The Court further held that in such case, courts cannot retry the determination of the Attorney General.[4]
The Second Circuit of the U.S. Court of Appeals considered whether a former member of the Palestinian Liberation Organization (PLO) was properly denied entry into the United States in Azzouka v. Sava (Azzouka I), 777 F.2d 68 (2d Cir.1985), and Azzouka v. Meese (Azzouka II), 820 F.2d 585 (2d Cir.1987). The court held that "exclusion under section 235(c) is subject to reviewalbeit a limited oneon habeas corpus." The court further explained that a court is permitted to "inquire into the Government's reasons" but is proscribed from probing into the wisdom or basis of those reasons. It articulated a "facially legitimate and bona fide reason" standard for judicial review under a section 235(c) exclusion order.
Petitioner's basic thrust is not, however, that the Attorney General failed to articulate "facially legitimate and bona fide reasons" for exclusion, but rather that he has failed to follow and abide by his own properly constituted regulations. I have, in connection with the prior petition in this cause, reviewed the records both confidential and non-confidential and cannot gainsay the "facial" legitimacy of the Attorney General's conclusions. His 1968 conviction was not merely based on the firing of a "recoiless" rifle at a Polish vessel, but rather on evidence that he had threatened friendly foreign governments with the destruction of their ships and planes if they did not cease dealing with Cuba. His own statements before the parole commission establish that he fled the United States in 1974 in order to carry on his fight with the Castro Government of Cuba. The Attorney General's confidential information further supports the facial validity of the order of exclusion of Petitioner under 8 U.S.C. § 1182(a), subsections (27), (28) and (29).
Petitioner relies upon the decision of the Supreme Court in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) and Service *949 v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) for the proposition that by delegating power under the INS regulations, the Attorney General relinquishes his authority for as long as the regulations remain in effect. However, under 8 U.S.C. § 1103 (describing the powers and duties of the Attorney General and INS Commissioner), Congress specifically provides that the Attorney General's determination shall be controlling with respect to all questions of law.[5] 8 U.S.C. § 1103(a). Furthermore, 8 C.F.R. § 2.1, the regulation which describes the Commissioner's delegated power, specifically reserves to the Attorney General the authority to enforce the provisions of the Immigration and Nationality Act.[6]
Accardi can be distinguished on its facts. In that case, unlike the case at bar, the Attorney General interfered with the independence of the Board of Immigration Appeals' decision whether to deport an alien. The Supreme Court held that the regulations bound the Attorney General to refrain from interfering with the Board's decision. Had the Attorney General waited until after the Board had announced its decision to then reverse the Board, it is clear that his actions would have been procedurally sound. Indeed, the court makes it plain that in any event, and regardless of the Board's decision, the Attorney General will have the last word.
The Service case is likewise distinguishable. In that case, a Foreign Service Officer was accused of espionage and threatened with termination of employment as a security risk. Pursuant to regulation, he was given a hearing. A hearing board exonerated him, and the Deputy Under Secretary of State approved the findings. A post-audit review board subsequently conducted an unauthorized hearing, and found reasonable doubt of the officer's loyalty. Consequently, he was discharged by the Secretary of State. Because the regulations only authorized review of the hearing board after an unfavorable decision, the Supreme Court invalidated the officer's termination and affirmed the board's decision.
The case at bar differs from Service in that the party here challenging the procedure is an alien seeking entry into the United States under no claim of right. The government employee in Service was in a quite different position not only from a "rights" standpoint, but also because of the different regulations involved. This court finds that neither Congress nor the Attorney General intended to irrevocably delegate the Attorney General's power to exclude aliens on the basis of national security, and that the Attorney General's decision must stand.
The immigration laws and certain of the regulations in furtherance of them present a maze which understandably causes confusion. For example, under 8 C.F.R. § 235.8(c), relating to temporary exclusion, the decision of the Regional Commissioner *950 is said to be final, with no appeal permitted. However, reference to 8 C.F.R. Part II, § 2.1 ("Authority of the Commissioner") demonstrates that the delegation of powers to the Commissioner is "without divesting the Attorney General of any of his powers, privileges or duties under the immigration and naturalization laws ..." In short, the government argues, the several levels of preliminary adjudication are only advisory insofar as rulings favorable to the alien are concerned. While such a result appears to present a "heads, I win; tails, you lose" situation, where an unadmitted alien is concerned, the applicable law and regulations counsel this conclusion.

III.
I further find that the Acting Associate Attorney General had the authority to deny Petitioner an asylum hearing and withholding of deportation. An alien who is found by the Attorney General to be a threat to national security is not entitled to an asylum hearing. Azzouka v. Sava, 777 F.2d 68, 76 (2nd Cir.1985). The Acting Attorney General, having determined that Petitioner constitutes a threat to national security, was within his authority to summarily deny Petitioner an asylum hearing.
Immigration regulations except aliens reasonably regarded as a danger to national security from the class of aliens of which the Attorney General must withhold deportation. 8 U.S.C. § 1253(h)(2)(D). The Attorney General specifically directed the Acting Associate Attorney General to dispose of Petitioner's application for withholding of deportation, and we find that he did so without abusing his discretion.
I find it difficult to conclude this order without additional comment. No doubt encouraged in the early 1960's by a benign government becoming painfully aware of the reality of the "New Cuba" Bosch embarked on a dangerous course which ended in collision with a change in attitudes shaped by a variety of events within and without this country. And while the Attorney General reflects these changes by his order, he is unwilling to accept Petitioner's plea that he, too, has changed. The AAAG's order notes that there is no substantial information to indicate that Bosch has renounced terrorism. Petitioner has, of course, been in prison for over a decade and now states that he has abandoned his prior ways. Petitioner's statements of intention and change go further, in this court's opinion, than those referred to in the AAAG's opinion.
Whether this court accepts Bosch's protestations, or concludes, as did two levels of the AG's immigration decisional structure, that Petitioner is no longer a security risk, is legally unimportant. The significant distinction which separates the Executive from the Judiciary spells the answer here. The Writ of Habeas Corpus shall issue only if Petitioner's present confinement is, for some reason, in violation of the Constitution. Bosch contends he has been denied procedural due process. The argument made for Petitioner was indeed persuasive, but succumbs to careful examination of the applicable statutes and regulations. The ultimate power of exclusion remains in the Attorney General regardless of the position taken by his regional commissioner. While, under the language of the regulation, this evolution, the "process" (see, 8 C.F.R. § 2.1, etc.) may be inconsistent and even contradictory, it is nonetheless, the "process" which both Congress and the Executive have approved. It is the due process to which Petitioner is entitled. More important than any particular case, no matter what the equities, is the court's recognition of these constitutional fundamentals. The responsibility for the decision as to Mr. Bosch's exclusion is with the Executive. That decision has been made, and is essentially unreviewable, absent a clear violation of the very limited procedural benefits afforded the Petitioner. None has been demonstrated. In view of this court's findings as expressed above, and in the sincere hope that this order does not become Petitioner's epitaph the Petition for Writ of Habeas Corpus must be DENIED.
In order to give the Petitioner an opportunity to appeal this order, the government is directed to refrain from deporting Petitioner until further order of this court, or *951 until such time as the Court of Appeals terminates this stay.
DONE and ORDERED.
NOTES
[1] "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Shaughnessy v. Mezei, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956 (1953).
[2] See dissenting opinions in Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950) and Shaughnessy v. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953); Davis, "The Requirement of a Trial-Type Hearing," 70 Harv. Law Rev. 193, 249-51 (1956); "Immigration law and the Excluded Alien," 15 U.C. Davis L.Rev. 723-40 (Feb.1982); Symposium, Due Process and the Treatment of Aliens," 44 Pitt.L.Rev. 165-328 (1983); Comment, "Developments in the LawImmigration Policy and the Right of Aliens," 96 Harv.L.Rev. 1286-1465 (1983).
[3] The Mezei doctrine was upheld in the Eleventh Circuit as recently as 1984 in the case of Jean v. Nelson, 727 F.2d 957 (11th Cir.1984), aff'd, Jean v. Nelson, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); aff'd in part, vacated in part, Jean v. Nelson, 863 F.2d 759 (11th Cir. 1988).
[4] The power given the Executive Branch (the Attorney General) by Congress is extensive. In United States ex rel. Accardi v. Shaughnessy, 347 U.S. at 269, 74 S.Ct. at 504, the court stated that:

Congress vested in the Attorney General, and in him alone, discretion as to whether to suspend deportation under certain circumstances. We think a refusal to exercise that discretion is not reviewable on habeas corpus, first, because the nature of the power and discretion vested in the Attorney General is analogous to the power of pardon or commutation of a sentence, which we trust no one thinks is subject to judicial control; and second, because no legal right exists in petitioner by virtue of constitution, statute or common law to have a lawful order of deportation suspended. Even if petitioner proves himself eligible for suspension, that gives him no right to it as a matter of law but merely establishes a condition precedent to exercise of discretion by the Attorney General. Habeas corpus is to enforce legal rights, not to transfer to the courts control of executive discretion.
[5] 8 U.S.C. § 1103(a) states in pertinent part:

The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: Provided, however, That determination and ruling by the Attorney General with respect to all questions of law shall be controlling.
... He shall establish such regulations; ... as he deems necessary for carrying out his authority under the provisions of this chapter. He is authorized ... to appoint such employee of the Service as he deems necessary, and to delegate to them or to any officer or employee of the Department of Justice in his discretion any of the duties and powers imposed upon him in this chapter.
[6] 8 C.F.R. § 2.1 provides that:

"Without divesting the Attorney General of any of his powers, privileges, or duties under the immigration and naturalization laws, and except as to the Executive Office, the Board, the Office of the Chief Special Inquiry Officer, and Special Inquiry Officers, there is delegated to the Commissioner the authority of the Attorney General to direct the administration of the Service and to enforce the Act and all other laws relating to the immigration and naturalization of aliens. The Commissioner may issue regulations as deemed necessary or appropriate for the exercise of any authority delegated to him by the Attorney General, and may redelegate any such authority to any other officer or employee of the Service.