FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 17 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF WASHINGTON and STATE OF MINNESOTA,<br><br>Plaintiffs-Appellees,<br><br>v.<br><br>DONALD J. TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; REX W. TILLERSON, Secretary of State; JOHN F. KELLY, Secretary of the Department of Homeland Security; UNITED STATES OF AMERICA,<br>Defendants-Appellants. | No. 17-35105<br><br>D.C. No. 2:17-cv-00141 Western District of Washington, Seattle<br><br>AMENDED ORDER |

Before: CANBY, CLIFTON, and FRIEDLAND, Circuit Judges.

This court in a published order previously denied a motion of the government for a stay of a restraining order pending appeal. 847 F.3d 1151 (9th Cir. 2017). That order became moot when this court granted the government's unopposed motion to dismiss its underlying appeal. Order, Mar. 8, 2017. No party has moved to vacate the published order. A judge of this court called for a vote to determine whether the court should grant en banc reconsideration in order to vacate the published order denying the stay. The matter failed to receive a majority of the votes of the active judges in favor of en banc reconsideration.

Vacatur of the stay order is denied. *See U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994) (holding that the "extraordinary remedy of vacatur" is ordinarily unjustified when post-decision mootness is caused by voluntary action of the losing party).

This order is being filed along with a concurrence from Judge Reinhardt, a concurrence from Judge Berzon, a dissent from Judge Kozinski, a dissent from Judge Bybee, and a dissent from Judge Bea. No further opinions will be filed.

*Washington v. Trump*, No. 17-35105

REINHARDT, J., concurring in the denial of en banc rehearing:

I concur in our court's decision regarding President Trump's first Executive Order – the ban on immigrants and visitors from seven Muslim countries.  I also concur in our court's determination to stand by that decision, despite the effort of a small number of our members to overturn or vacate it.  Finally, I am proud to be a part of this court and a judicial system that is independent and courageous, and that vigorously protects the constitutional rights of all, regardless of the source of any efforts to weaken or diminish them.

Judge Kozinski's diatribe, filed today, confirms that a small group of judges, having failed in their effort to undo this court's decision with respect to President Trump's first Executive Order, now seek on their own, under the guise of a dissent from the denial of en banc rehearing of an order of voluntary dismissal, to decide the constitutionality of a second Executive Order that is not before this court.  That is hardly the way the judiciary functions.  Peculiar indeed!

BERZON, J., concurring in the denial of reconsideration en banc.

I concur in the court's denial of rehearing en banc regarding vacatur. I have full confidence in the panel's decision. I write to emphasize that, although one would think otherwise from the three dissents from denial of rehearing en banc, judges are empowered to decide issues properly before them, not to express their personal views on legal questions no one has asked them. There is no appeal currently before us, and so no stay motion pending that appeal currently before us either. In other words, all the merits commentary in the dissents filed by a small minority of the judges of this court is entirely out of place.

Here is the background: A three-judge panel of this court decided that the Government was not entitled to a stay pending appeal of the district court's Temporary Restraining Order enjoining enforcement of the President's January 27, 2017 Executive Order. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017). The Government chose not to challenge the panel's order further but instead to draft a revised Executive Order, revoking the one that was before this court's panel. Exec. Order 13780 of March 6, 2017 §§ 1(i), 13, 82 Fed. Reg. 13209 (published Mar. 9, 2017). That Order was expressly premised on the panel opinion. *Id.* § 1(c), (i). The Government has since elected to dismiss this appeal,

1

and with it its stay request; it filed an unopposed motion to dismiss, which we granted, and did *not* in that motion ask that the panel, or an en banc court, vacate the panel's opinion.[1]

So there is now *no* live controversy before our court regarding either the merits of the underlying case or the propriety of the original restraining order. "In our system of government, courts have no business deciding legal disputes or expounding on law in the absence of . . . a case or controversy." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (internal quotation marks omitted) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).

One judge of the court nonetheless called for a vote of the active judges as to whether to convene an en banc court for the sole purpose of vacating the panel's opinion. As the panel's March 15, 2017 order, denying rehearing en banc, notes, vacating an opinion where the losing party's voluntary actions have mooted the appeal is ordinarily improper. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25–27 (1994); *United States v. Payton*, 593 F.3d 881, 883–86 (9th Cir. 2010). And as Judge Bybee's dissent reflects, the only justification

---

[1] On the contrary, both parties have since relied on the opinion in staking out their positions. *See* Exec. Order 13780 § 1(c), (i); Resp. to Defs.' Notice of Filing of Exec. Order at 2-11, *Washington v. Trump*, No. 2:17-cv-00141-JLR (W.D. Wash. Mar. 9, 2017).

2

offered for vacating the opinion was a disagreement on the merits.

It is simply not an "exceptional circumstance[]" justifying the "extraordinary remedy of vacatur" that members of our court disagree with a panel opinion. *See Bonner Mall*, 513 U.S. at 26, 29. I am aware of *no* instance in which we have convened an en banc panel to vacate a precedential opinion on the basis of its merits, where no party seeks further appellate review or vacatur. *Compare Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 725–27 (9th Cir. 2007) (en banc) (Bybee, J., concurring) (vacating a panel opinion in light of a settlement agreement dependent on vacatur reached *after* a majority of the court already had voted to take the case en banc and designated the panel's opinion non-precedential). Rather, it is "inappropriate . . . to vacate mooted cases, in which we have no constitutional power to decide the merits, on the basis of assumptions about the merits." *Bonner Mall*, 513 U.S. at 27.

We as a court make the vast majority of our decisions through three-judge panels, and we abide by the decisions of those panels absent a decision by a majority of the active judges that there is good reason to reconsider the case with a larger, eleven-judge panel, determined by lot. *See* Fed. R. App. P. 35; Ninth Cir. R. 35-3; Ninth Cir. Gen. Order 5.1–5.5. Reconsidering a case before an en banc panel after full argument and coming to a new, reasoned decision—which might

3

reach the same result as the earlier panel decision or might conclude otherwise—is an entirely different matter from what was sought here: wiping out the panel's decision and leaving a vacuum. The en banc court would have no authority whatever to opine on the merits of the case or the propriety of the district court's stay, as there is simply no live appeal before us.

Article III of the United States Constitution precludes us from revisiting the issues addressed in the panel opinion at this point, as any decision rendered by the en banc court necessarily would be advisory. *See Already LLC*, 133 S. Ct. at 726. A few dissenting colleagues have nonetheless used the decision by the active judges of the court to decline to rewrite history as the occasion to attack the panel opinion on myriad grounds. As there is nothing pending before us, it would be entirely inappropriate to respond in detail—which, I presume, is precisely why the panel did not do so.

In some ways that is too bad. There is much to discuss, and such discussion would show that the panel's opinion was quite correct.

To take but one example: The cases Judge Bybee cites regarding the applicability of *Kleindienst v. Mandel*, 408 U.S. 753 (1972), do not govern the case as it came to the panel. None addresses whether the "facially legitimate and bona fide reason" standard articulated in *Mandel* applies to executive action that

4

categorically revokes permission to enter or reenter the country *already granted* by the Executive Branch. *See Kerry v. Din*, 135 S. Ct. 2128, 2139 (2015) (Kennedy, J., concurring in the judgment); *Fiallo v. Bell*, 430 U.S. 787, 792–95 (1977); *Cardenas v. United States*, 826 F.3d 1164, 1171–72 (9th Cir. 2016); *An Na Peng v. Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012); *Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 978–79 (9th Cir. 2006); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065–66 (9th Cir. 2003); *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001). That the Second Circuit applied *Mandel*'s test to a program requiring certain non-immigrants to provide information to authorities (and to face removal only *after* undergoing "generally applicable legal [removal] proceedings to enforce pre-existing immigration laws"), *see Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008), in no way portends that application of *Mandel* was appropriate here. The question before our panel, unlike the one in *Rajah*, concerned a sweeping Executive Order that *barred* from entry whole groups of legal permanent residents and visa holders, among many others, *without* any individualized determination regarding the revocation. Presumably recognizing the weight of these individuals' constitutional interests, the President excepted them from the revised Executive Order. *See* Exec. Order 13780 § 3.

Judges Kozinski and Bea likewise used the filing of the order denying rehearing en banc as to the question of vacating the panel opinion as a platform for providing their personal views as to the merits of that opinion. Both concern themselves with issues the panel expressly did not finally resolve. *See* Bea, J., dissenting from denial of rehearing en banc, at 3–6 (discussing *parens patriae* standing); Kozinski, J., dissenting from denial of rehearing en banc, at 3–7 (discussing the Establishment Clause); *Washington*, 847 F.3d at 1161 n.5, 1168 (explicitly declining to reach the questions of *parens patriae* standing and, after outlining the parameters of the appropriate Establishment Clause analysis, not coming to rest on the likelihood of success with respect to that issue). Further, Judge Kozinski expresses at some length his unhappiness with the invocation of the panel's Establishment Clause analysis in a recent district court order, once again venturing an opinion on an appeal not before us—in this instance, not because the appeal was withdrawn but because none has yet been filed.[2]

---

[2]Judge Kozinski also contests the scope of the Temporary Restraining Order the panel declined to stay, observing that relatively few of the affected individuals have lawful status. Again, this was not the occasion to opine on the contours of a now-moot injunction. And, contrary to Judge Kozinski's representation, the number of individuals covered directly by the panel's due process analysis was substantial—there were tens-of-thousands of individuals whose already approved visas were revoked. *See* Mica Rosenberg & Lesley Wroughton, *Trump's Travel Ban Has Revoked 60,000 Visas for Now*, Reuters, Feb. 3, 2017,

(continued...)

6

There will be ample opportunity, and probably soon, *see* Order Granting

Motion for Temporary Restraining Order, *Hawaii v. Trump*, No. 1:17-cv-00050

DKW-KSC (D. Haw. Mar. 15, 2017), for further review of the important issues

raised by the President's Executive Orders.  And it is apparent from the

Government's delay in promulgating a new Executive Order, and in the ten-day

delay in implementation within the revised Order, *see* Exec. Order 13780 § 14, that

no overwhelming exigency counsels in favor of abandoning the ordinary process of

adversarial appellate review.

I well understand the importance of the cases concerning these Executive

Orders.  They raise critical questions concerning the reach of executive and judicial

authority, and they could profoundly affect the lives of our citizens, our

communities, and our position in the world.  It is their very seriousness that, in my

view, commands that we as judges speak about them when we have authority to do

so, which is when we are asked by litigants to settle a dispute.  The court at large

has not been asked.  So my dissenting colleagues should not be engaging in a one-

sided attack on a decision by a duly constituted panel of this court.

We will have this discussion, or one like it.  But not now.

---

[2](...continued)
http://www.reuters.com/article/us-usa-immigration-visas-idUSKBN15I2EW
(citing figures provided by the Government).

Washington v. Trump, No. 17-35105

KOZINSKI, Circuit Judge, with whom Circuit Judges BYBEE, CALLAHAN, BEA and IKUTA join, dissenting from the denial of reconsideration en banc.

I write separately to highlight two peculiar features of the panel's opinion. First, the panel's reasoning rests solely on Due Process. But the vast majority of foreigners covered by the executive order have no Due Process rights. Nevertheless, the district court enjoined the order's travel provisions in their entirety, even as applied to the millions of aliens who have no constitutional rights whatsoever because they have never set foot on American soil. See Zadvydas v. Davis, 533 U.S. 678, 693 (2001); United States v. Verdugo-Urquidez, 494 U.S. 259, 269 (1990). In short, the panel approves the district court's nationwide injunction using a rationale that applies to a small percentage of those covered by the President's order.

The panel itself seems to acknowledge this strange state of affairs when it notes that there "might be persons covered" by the district court's restraining order who have no Due Process claims. Panel Order at 23. "Might" indeed! The overwhelming majority of the hundreds of millions of people covered by the order lack Due Process claims; only a tiny proportion have been accorded lawful status. Yet the panel offers no explanation for allowing the district court's extraordinarily broad restraining order to stand in full. This St. Bernard is being wagged by a flea

on its tail.

Because we have an obligation to maintain as much of the order as is legal, we normally ask: Can we keep it operational in a way that avoids constitutional conflict? The law of our circuit is that we consider the severability of an executive order just as we would consider the severability of a statute. See Matter of Reyes, 910 F.2d 611, 613 (9th Cir. 1990); see also Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 191 (1999) (assuming without deciding that the same severability analysis applies to executive orders as to statutes).[1] If we applied this framework to the executive order, we would "refrain from invalidating more of the [order] than is necessary" and "maintain the [order] in so far as it is valid." Regan v. Time, Inc., 468 U.S. 641, 652 (1984). This would have been easy: We could have approved the injunction as to the relatively few who have lawful status in the United States and allowed the executive order to cover everyone else. This workable solution would have respected the President's prerogative to regulate immigration as delegated to him by 8 U.S.C. § 1182(f), a provision about which the panel says nothing.

---

[1] Indeed, we know that this executive order can be severed because the district court did precisely that: It enjoined the five subsections of the executive order relating to travel and left the other eleven intact. Washington v. Trump, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017) (order granting temporary restraining order).

Which brings me to the second peculiar feature of the opinion, a topic about which the panel says all too much: the Establishment Clause. While its opinion does not come to rest on this issue, the panel still sows chaos by holding "that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." Panel Order at 25. This matters because one Establishment Clause test requires a showing of secular purpose,[2] and the panel gives its imprimatur to considering the "numerous statements by the President" about Muslims, most of them made before he was elected or took office. Id. This holding has continued vitality: It was relied on only days ago by a district judge in Hawaii who, in the ongoing contretemps between our circuit and the executive, enjoined the President's new executive order nationwide. See Hawaii v. Trump, No. 17-00050 DKW-KSC (D. Haw. Mar. 15, 2017) (order granting temporary restraining order). Indeed, this holding is spreading like kudzu through the federal courts. See Int'l Refugee Assistance

---

[2] I don't endorse Lemon v. Kurtzman, 403 U.S. 602 (1971), as the appropriate test in this context. Like Judge Bybee, I am puzzled why Lemon should be plucked from domestic contexts and applied to laws affecting immigration. See Bybee Dissental at 8 n.6. If we apply this test so casually to immigration policy, I see no reason it should not apply to every foreign policy decision made by the political branches, including our dealings with various theocracies across the globe. I see many reasons to resist this gross intrusion of the judicial power into foreign affairs.

Project v. Trump, No. 17-00361-TDC, at 5, 29 (D. Md. Mar. 16, 2017).

Taking a cue from the panel's opinion and citing a trove of informal and unofficial statements from the President and his advisers, see Hawaii at 33–37, the district judge found that plaintiffs had shown "a strong likelihood of succeeding on their claim" that the new order violates the Establishment Clause, id. at 41. And why shouldn't he? After all, the panel made this evidentiary snark hunt the law of the Ninth Circuit; the district judge was (in his own word) "commanded" to follow it. Id. at 32.

This is folly. Candidates say many things on the campaign trail; they are often contradictory or inflammatory.[3] No shortage of dark purpose can be found by sifting through the daily promises of a drowning candidate, when in truth the poor shlub's only intention is to get elected. No Supreme Court case—indeed no case anywhere that I am aware of—sweeps so widely in probing politicians for

---

[3] There is an anecdote, doubtless apocryphal, about Franklin Roosevelt during a whistlestop tour. He had two speeches that took opposite positions on a hot-button issue of the day. When the train stopped at a town that favored the issue, he would give his "pro" speech. And in towns that opposed the issue he'd give his "con" speech. One day he approached a town that his advisors told him was divided evenly between the pros and cons. FDR's advisers worried about how he'd handle the situation, but FDR was undaunted. He gave a speech and when he was done the pros in the audience believed he was in their corner and the cons were convinced he agreed with them. And that, friends, is the nature of electoral politics.

unconstitutional motives.[4]  And why stop with the campaign?  Personal histories, public and private, can become a scavenger hunt for statements that a clever lawyer can characterize as proof of a -phobia or an -ism, with the prefix depending on the constitutional challenge of the day.

This path is strewn with danger.  It will chill campaign speech, despite the fact that our most basic free speech principles have their "fullest and most urgent application precisely to the conduct of campaigns for political office." McCutcheon v. Fed. Election Comm'n, 134 S. Ct. 1434, 1441 (2014) (citation and internal quotation marks omitted).  And it will mire us in a swamp of unworkable litigation.  Eager research assistants can discover much in the archives, and those findings will be dumped on us with no sense of how to weigh them.  Does a Meet the Press interview cancel out an appearance on Face the Nation?  Does a year-old presidential proclamation equal three recent statements from the cabinet?  What is the appropriate place of an overzealous senior thesis or a poorly selected yearbook quote?

Weighing these imponderables is precisely the kind of "judicial

---

[4]  Respect for a coordinate branch should also counsel against focusing on campaign statements.  Candidate Trump, unlike President Trump, had not taken an oath to "preserve, protect and defend the Constitution," U.S. Const. art. II, § 1, cl. 8, and was not bound to "take Care that the Laws be faithfully executed," id. art. II, § 3.

psychoanalysis" that the Supreme Court has told us to avoid.  McCreary County v. ACLU of Ky., 545 U.S. 844, 862 (2005).  The hopelessness of this weighing exercise is why the Supreme Court has never  "deferred to comments made by [government] officials to the media."  Hamdan v. Rumsfeld, 548 U.S. 557, 623–24 n.52 (2006).  And it's why the panel's case citations for the supposedly "well established" proposition that the President's informal statements are admissible, upon closer inspection, turn out to refer to a much more limited universe: the text of city council resolutions, early drafts of legislation, transcripts of legislative discussions and contemporaneous statements by legislative members.  See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534–35 (1993); Larson v. Valente, 456 U.S. 228, 254 (1982); Vill. of Arlington Heights v. Metro Housing Dev. Corp., 429 U.S. 252, 268 (1977).  Limiting the evidentiary universe to activities undertaken while crafting an official policy makes for a manageable, sensible inquiry.  But the panel has approved open season on anything a politician or his staff may have said, so long as a lawyer can argue with a straight face that it signals an unsavory motive.

Even if a politician's past statements were utterly clear and consistent, using them to yield a specific constitutional violation would suggest an absurd result—namely, that the policies of an elected official can be forever held hostage

by the unguarded declarations of a candidate. If a court were to find that campaign skeletons prevented an official from pursuing otherwise constitutional policies, what could he do to cure the defect? Could he stand up and recant it all ("just kidding!") and try again? Or would we also need a court to police the sincerity of that mea culpa—piercing into the public official's "heart of hearts" to divine whether he <u>really</u> changed his mind, just as the Supreme Court has warned us not to? <u>See</u> <u>McCreary</u>, 545 U.S. at 862.

This is yet another reason my colleagues err by failing to vacate this hasty opinion. The panel's unnecessary statements on this subject will shape litigation near and far.[5] We'll quest aimlessly for true intentions across a sea of insults and hyperbole. It will be (as it were) a huge, total disaster.

---

[5] Contrary to the claims of Judges Reinhardt and Berzon, the substance of the panel's opinion continues to be highly relevant. Because the panel has refused to vacate it, the opinion continues to be the law of the circuit and is being followed by courts in the circuit and elsewhere. My criticism bears directly on the mistake our court has made in failing to vacate the opinion, and will hopefully warn other courts away from similar errors. My colleagues' effort to muzzle criticism of an egregiously wrong panel opinion betrays their insecurity about the opinion's legal analysis.

*Washington v. Trump*, No. 17-35105

BYBEE, Circuit Judge, with whom KOZINSKI, CALLAHAN, BEA, and IKUTA, Circuit Judges, join, dissenting from the denial of reconsideration *en banc*.

I regret that we did not decide to reconsider this case *en banc* for the purpose of vacating the panel's opinion. We have an obligation to correct our own errors, particularly when those errors so confound Supreme Court and Ninth Circuit precedent that neither we nor our district courts will know what law to apply in the future.

The Executive Order of January 27, 2017, suspending the entry of certain aliens, was authorized by statute, and presidents have frequently exercised that authority through executive orders and presidential proclamations. Whatever we, as individuals, may feel about the President or the Executive Order,[1] the President's decision was well within the powers of the presidency, and "[t]he wisdom of the policy choices made by [the President] is not a matter for our consideration." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 165 (1993).

---

[1] Our personal views are of no consequence. I note this only to emphasize that I have written this dissent to defend an important constitutional principle—that the political branches, informed by foreign affairs and national security considerations, control immigration subject to limited judicial review—and not to defend the administration's policy.

This is not to say that presidential immigration policy concerning the entry of aliens at the border is immune from judicial review, only that our review is limited by *Kleindienst v. Mandel*, 408 U.S. 753 (1972)—and the panel held that limitation inapplicable. I dissent from our failure to correct the panel's manifest error.

## I

In this section I provide background on the source of Congress's and the President's authority to exclude aliens, the Executive Order at issue here, and the proceedings in this case. The informed reader may proceed directly to Part II.

## A

"The exclusion of aliens is a fundamental act of sovereignty." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982). Congress has the principal power to control the nation's borders, a power that follows naturally from its power "[t]o establish an uniform rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and from its authority to "regulate Commerce with foreign Nations," *id.* art. I, § 8, cl. 3, and to "declare War," *id.* art. I, § 8, cl. 11. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power . . . ."). The

2

President likewise has some constitutional claim to regulate the entry of aliens into the United States. "Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'" *Garamendi*, 539 U.S. at 414 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). The foreign policy powers of the presidency derive from the President's role as "Commander in Chief," U.S. Const. art. II, § 2, cl. 1, his right to "receive Ambassadors and other public Ministers," *id.* art. II, § 3, and his general duty to "take Care that the Laws be faithfully executed," *id. See Garamendi*, 539 U.S. at 414. The "power of exclusion of aliens is also inherent in the executive." *Knauff*, 338 U.S. at 543.

In the Immigration and Nationality Act of 1952, Congress exercised its authority to prescribe the terms on which aliens may be admitted to the United States, the conditions on which they may remain within our borders, and the requirements for becoming naturalized U.S. citizens. 8 U.S.C. § 1101 *et seq.* Congress also delegated authority to the President to suspend the entry of "any class of aliens" as he deems appropriate:

Whenever the President finds that the entry of any aliens or of any

class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*Id.* § 1182(f). Many presidents have invoked the authority of § 1182(f) to bar the entry of broad classes of aliens from identified countries.[2]

In Executive Order No. 13769, the President exercised the authority granted in § 1182(f). Exec. Order No. 13769 § 3(c) (Jan. 27, 2017), *revoked by* Exec. Order No. 13780 § 1(i) (Mar. 6, 2017). The Executive Order covered a number of subjects. Three provisions were particularly relevant to this litigation. First, the Executive Order found that "the immigrant and nonimmigrant entry into the United States of aliens from [seven] countries . . . would be detrimental to the interests of the United States" and ordered the suspension of entry for nationals (with certain exceptions) from those countries for 90 days. *Id.* The seven countries were Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. Second, it directed the Secretary of State to suspend the U.S. Refugee Admissions Program (USRAP) for 120 days.

---

[2] *See*, *e.g.*, Exec. Order No. 12324 (Sept. 29, 1981) (Reagan and Haiti); Proclamation No. 5517 (Aug. 22, 1986) (Reagan and Cuba); Exec. Order No. 12807 (May 24, 1992) (George H.W. Bush and Haiti); Proclamation No. 6958 (Nov. 22, 1996) (Clinton and Sudan); Proclamation No. 7359 (Oct. 10, 2000) (Clinton and Sierra Leone); Exec. Order No. 13276 (Nov. 15, 2002) (George W. Bush and Haiti); Exec. Order No. 13692 (Mar. 8, 2015) (Obama and Venezuela); Exec. Order No. 13726 (Apr. 19, 2016) (Obama and Libya).

However, exceptions could be made "on a case-by-case basis" in the discretion of the Secretaries of State and Homeland Security. Once USRAP resumed, the Secretary of State was "to prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual [was] a minority religion in the individual's country of nationality." *Id.* § 5(a), (b), (e). Third, it suspended indefinitely the entry of Syrian refugees. *Id.* § 5(c).

B

Three days after the President signed the Executive Order, the States of Washington and Minnesota brought suit in the Western District of Washington seeking declaratory and injunctive relief on behalf of their universities, businesses, citizens, and residents that were affected by the Executive Order in various ways. The States also sought a temporary restraining order (TRO). On February 3, 2017, following a hearing, the district court, without making findings of fact or conclusions of law with respect to the merits of the suit, issued a nationwide TRO against the enforcement of §§ 3(c), 5(a)–(c), (e). The district court proposed further briefing by the parties and a hearing on the States' request for a preliminary injunction.[3]

---

[3] That same day, the district court for the District of Massachusetts denied a preliminary injunction to petitioners challenging the Executive Order on equal protection, Establishment Clause, due process, and APA grounds. *Louhghalam v.*

The United States sought a stay of the district court's order pending an appeal. A motions panel of our court, on an expedited basis (including oral argument by phone involving four time zones), denied the stay. *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).

Among other things, the panel drew three critical conclusions. First, the panel held that, although we owe deference to the political branches, we can review the Executive Order for constitutionality under the same standards as we would review challenges to domestic policies. *See id.* at 1161–64. Second, the panel found that the States were likely to succeed on their due process arguments because "the Executive Order [does not] provide[] what due process requires, such as notice and a hearing prior to restricting an individual's ability to travel." *Id.* at 1164. Third, the panel found that there were at least "significant constitutional questions" under the Establishment Clause raised by the fact that the seven countries identified in the Executive Order are principally Muslim countries and the President, before and after his election, made reference to "a Muslim ban." *Id.* at 1168.

---

*Trump*, No. 17-10154-NMG, 2017 WL 479779 (D. Mass. Feb. 3, 2017). The following week, the district court for the Eastern District of Virginia granted a preliminary injunction against enforcement of the Executive Order in Virginia. The court's sole grounds were based on the Establishment Clause. *Aziz v. Trump*, No. 1:17-cv-116 (LMB/TCB), 2017 WL 580855 (E.D. Va. Feb. 13, 2017).

In response to the panel's decision not to stay the district court's TRO

pending appeal, a judge of our court asked for *en banc* review. The court invited

the parties to comment on whether the entire court should review the judgment.

The U.S. Department of Justice asked that the panel hold the appeal while the

administration considered the appropriate next steps and vacate the opinion upon

the issuance of any new executive order. A majority of the court agreed to stay the

*en banc* process. In the end, the President issued a new Executive Order on March

6, 2017, that referred to the panel's decision and addressed some of the panel's

concerns. In light of the new Executive Order, the Department of Justice moved to

dismiss the appeal in this case. The panel granted the motion to dismiss but did not

vacate its precedential opinion.[4]

Ordinarily, when an appeal is dismissed because it has become moot, any

opinions previously issued in the case remain on the books. *U.S. Bancorp Mortg.*

*Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994) ("Judicial precedents are

presumptively correct and valuable to the legal community as a whole. They . . .

should stand unless a court concludes that the public interest would be served by a

---

[4] Proceedings in the original suit filed by Washington and Minnesota are still pending in the Western District of Washington. The State of Hawaii also filed suit in the District of Hawaii and has asked for a TRO enjoining the second Executive Order. *See* Plaintiffs' Motion for Temporary Restraining Order, *Hawai'i v. Trump*, No. 1:17-cv-00050-DKW-KSC (D. Haw. Mar. 8, 2017), ECF No. 65.

vacatur." (citation omitted)).  The court, however, has discretion to vacate its

opinion to "clear[] the path for future relitigation of the issues between the parties,"

*United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950), or where "exceptional

circumstances . . . counsel in favor of such a course," *U.S. Bancorp Mortg.*, 513

U.S. at 29.  We should have exercised that discretion in this case because the panel

made a fundamental error.[5]  It neglected or overlooked critical cases by the

Supreme Court and by our court making clear that when we are reviewing

decisions about who may be admitted into the United States, we must defer to the

judgment of the political branches.[6]  That does not mean that we have no power of

judicial review at all, but it does mean that our authority to second guess or to

probe the decisions of those branches is carefully circumscribed.  The panel's

analysis conflicts irreconcilably with our prior cases.  We had an obligation to

---

[5] We have previously said that it is procedurally proper for a judge "to seek
an en banc rehearing for the purpose of vacating [a panel's] decision." *United
States v. Payton*, 593 F.3d 881, 886 (9th Cir. 2010).

[6] To be clear, the panel made several other legal errors.  Its holding that the
States were likely to succeed on the merits of their procedural due process claims
confounds century-old precedent.  And its unreasoned assumption that courts
should simply plop Establishment Clause cases from the domestic context over to
the foreign affairs context ignores the realities of our world.  But these errors are
not what justified vacatur.  Instead, it is the panel's treatment of *Kleindienst v.
Mandel*, 408 U.S. 753 (1972), that called for an extraordinary exercise of our
discretion to vacate the panel's opinion.

vacate the panel's opinion in order to resolve that conflict and to provide consistent guidance to district courts and future panels of this court.

## II

The panel began its analysis from two important premises:  first, that it is an "uncontroversial principle" that we "owe substantial deference to the immigration and national security policy determinations of the political branches," *Washington*, 847 F.3d at 1161; second, that courts can review constitutional challenges to executive actions, *see id.* at 1164.  I agree with both of these propositions.  Unfortunately, that was both the beginning and the end of the deference the panel gave the President.

How do we reconcile these two titan principles of constitutional law?  It is indeed an "uncontroversial principle" that courts must defer to the political judgment of the President and Congress in matters of immigration policy.  The Supreme Court has said so, plainly and often.  *See*, *e.g.*, *Mathews v. Diaz*, 426 U.S. 67, 81 (1976) ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."); *Harisiades*, 342 U.S. at 590 ("[N]othing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require us to equate our political judgment with

9

that of Congress."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) ("Courts have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."); *Henderson v. Mayor of N.Y.*, 92 U.S. (2 Otto) 259, 270–71 (1876). On the other hand, it seems equally fundamental that the judicial branch is a critical backstop to defend the rights of individuals against the excesses of the political branches. *See INS v. Chadha*, 462 U.S. 919, 941 (1983) (reviewing Congress's use of power over aliens to ensure that "the exercise of that authority does not offend some other constitutional restriction" (quoting *Buckley v. Valeo*, 424 U.S. 1, 132 (1976))).

The Supreme Court has given us a way to analyze these knotty questions, but it depends on our ability to distinguish between two groups of aliens: those who are present within our borders and those who are seeking admission. As the Court explained in *Leng May Ma v. Barber*,

> It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, . . . and those who are within the United States after an entry, irrespective of its legality. In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of initial entry."

357 U.S. 185, 187 (1958) (quoting *Mezei*, 345 U.S. at 212). The panel did not

recognize that critical distinction and it led to manifest error. The panel's decision is not only inconsistent with clear Supreme Court authority, but the panel missed a whole bunch of our own decisions as well.

A

The appropriate test for judging executive and congressional action affecting aliens who are outside our borders and seeking admission is set forth in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). In *Mandel*, the government had denied a visa to a Marxist journalist who had been invited to address conferences at Columbia, Princeton, and Stanford, among other groups. Mandel and American university professors brought facial and as-applied challenges under the First and Fifth Amendments. The Court first made clear that Mandel himself, "as an unadmitted and nonresident alien, had no constitutional right of entry." *Id.* at 762. Then it addressed the First Amendment claims of the professors who had invited him. Recognizing that "First Amendment rights [were] implicated" in the case, the Court declined to revisit the principle that the political branches may decide whom to admit and whom to exclude. *Id.* at 765. It concluded that when the executive has exercised its authority to exclude aliens "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment

11

interests of those who seek personal communication with the applicant." *Id.* at 770.

In this case, the government argued that *Mandel* provided the proper framework for analyzing the States' claims. The panel, however, tossed *Mandel* aside because it involved only a decision by a consular officer, not the President. *See Washington*, 847 F.3d at 1162 ("The present case, by contrast, is not about the application of a specifically enumerated congressional policy to the particular facts presented in an individual visa application. Rather the States are challenging the President's *promulgation* of sweeping immigration policy."). Two responses. First, the panel's declaration that we cannot look behind the decision of a consular officer, but can examine the decision of the President stands the separation of powers on its head. We give deference to a consular officer making an individual determination, but not the President when making a broad, national security-based decision? With a moment's thought, that principle cannot withstand the gentlest inquiry, and we have said so. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 n.1 (9th Cir. 2008) ("We are unable to distinguish *Mandel* on the grounds that the exclusionary decision challenged in that case was not a consular visa denial, but rather the Attorney General's refusal to waive Mandel's inadmissibility. The holding is plainly stated in terms of the power delegated by Congress to 'the

12

Executive.'  The Supreme Court said nothing to suggest that the reasoning or outcome would vary according to which executive officer is exercising the Congressionally-delegated power to exclude.").  Second, the promulgation of broad policy is precisely what we expect the political branches to do; Presidents rarely, if ever, trouble themselves with decisions to admit or exclude individual visa-seekers.  *See Knauff*, 338 U.S. at 543 ("[B]ecause the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . for the best interests of the country during a time of national emergency.").  If the panel is correct, it just wiped out any principle of deference to the executive.

Worse, the panel's decision missed entirely *Fiallo v. Bell*, 430 U.S. 787 (1977), and *Fiallo* answers the panel's reasons for brushing off *Mandel*.  In *Fiallo*, the plaintiff brought a facial due process challenge to immigration laws giving preferential treatment to natural mothers of illegitimate children.  As in *Mandel*, the constitutional challenge in *Fiallo* was "based on [the] constitutional rights of citizens."  *Id.* at 795.  The Court acknowledged that the challenge invoked "'double-barreled' discrimination based on sex and illegitimacy."  *Id.* at 794.  Either ground, if brought in a suit in a domestic context, would have invoked some kind of heightened scrutiny.  *See Craig v. Boren*, 429 U.S. 190, 197 (1976) (sex

13

discrimination); *Trimble v. Gordon*, 430 U.S. 762, 769 (1977) (illegitimacy).

Rejecting the claim that "the Government's power in this area is never subject to judicial review," *Fiallo*, 430 U.S. at 795–96, 795 n.6, the Court held that *Mandel*'s "facially legitimate and bona fide reason" test was the proper standard: "We can see no reason to review the broad congressional policy choice at issue here under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795; *see also id.* at 794 (rejecting "the suggestion that more searching judicial scrutiny is required"). Importantly, the Court reached that conclusion despite the fact the immigration laws at issue promulgated "sweeping immigration policy," *Washington*, 847 F.3d at 1162, just as the Executive Order did.

The panel's holding that "exercises of policymaking authority at the highest levels of the political branches are plainly not subject to the *Mandel* standard," *id.*, is simply irreconcilable with the Supreme Court's holding that it could "see no reason to review the broad congressional policy choice at issue [there] under a more exacting standard than was applied in *Kleindienst v. Mandel*," *Fiallo*, 430 U.S. at 795.

*Fiallo* wasn't the only Supreme Court case applying *Mandel* that the panel missed. In *Kerry v. Din*, 135 S. Ct. 2128 (2015), the Court confronted a case in

14

which Din (a U.S. citizen) claimed that the government's refusal to grant her Afghani husband a visa violated her own constitutional right to live with her husband. A plurality held that Din had no such constitutional right. *Id.* at 2131 (plurality opinion). Justice Kennedy, joined by Justice Alito, concurred in the judgment, and we have held that his opinion is controlling. *Cardenas v. United States*, 826 F.3d 1164, 1171 (9th Cir. 2016). For purposes of the case, Justice Kennedy assumed that Din had a protected liberty interest, but he rejected her claim to additional procedural due process. "The conclusion that Din received all the process to which she was entitled finds its most substantial instruction in the Court's decision in *Kleindienst v. Mandel*." *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment) (citation omitted). After reciting *Mandel*'s facts and holding, Justice Kennedy concluded that "[t]he reasoning and the holding in *Mandel* control here. That decision was based upon due consideration of the congressional power to make rules for the exclusion of aliens, and the ensuing power to delegate authority to the Attorney General to exercise substantial discretion in that field." *Id.* at 2140. Once the executive makes a decision "on the basis of a facially legitimate and bona fide reason," the courts may "'neither look behind the exercise of that discretion, nor test it by balancing its justification against' the constitutional interests of citizens the visa denial might implicate." *Id.*

15

(quoting *Mandel*, 408 U.S. at 770).  Applying *Mandel*, Justice Kennedy concluded that "the Government satisfied any obligation it might have had to provide Din with a facially legitimate and bona fide reason for its action when it provided notice that her husband was denied admission to the country under [8 U.S.C.] § 1182(a)(3)(B)." *Id.* at 2141.  No more was required, and "[b]y requiring the Government to provide more, the [Ninth Circuit] erred in adjudicating Din's constitutional claims." *Id.*

The importance and continuing applicability of the framework set out in *Mandel* and applied in *Fiallo* and *Din* has been recognized in circumstances remarkably similar to the Executive Order.  After the attacks of September 11, 2001, the Attorney General instituted the National Security Entry-Exit Registration System.  That program required non-immigrant alien males (residing in the United States) over the age of sixteen from twenty-five countries—twenty-four Muslim-majority countries plus North Korea—to appear for registration and fingerprinting. One court referred to the program as "enhanced monitoring." *See Rajah v. Mukasey*, 544 F.3d 427, 433–34, 439 (2d Cir. 2008) (describing the program).[7] The aliens subject to the program filed a series of suits in federal courts across the

---

[7] The aliens subject to the program were designated by country in a series of notices.  The first notice covered five countries:  Iran, Iraq, Libya, Sudan, and Syria. *See Rajah*, 544 F.3d at 433 n.3.

United States.  They contended that the program unconstitutionally discriminated against them on the basis of "their religion, ethnicity, gender, and race."  *Id.* at 438.  Similar to the claims here, the petitioners argued that the program "was motivated by an improper animus toward Muslims."  *Id.* at 439.

Citing *Fiallo* and applying the *Mandel* test, the Second Circuit held that "[t]he most exacting level of scrutiny that we will impose on immigration legislation is rational basis review."  *Id.* at 438 (alteration in original) (citation omitted).  The court then found "a facially legitimate and bona fide reason for" the registration requirements because the countries were "selected on the basis of national security criteria."  *Id.* at 438–39.  The court rejected as having "no basis" the petitioners' claim of religious animus.  *Id.* at 439.  The court observed that "one major threat of terrorist attacks comes from radical Islamic groups."  *Id.*  It added:

> Muslims from non-specified countries were not subject to registration.  Aliens from the designated countries who were qualified to be permanent residents in the United States were exempted whether or not they were Muslims.  The program did not target only Muslims: non-Muslims from the designated countries were subject to registration.

*Id.*  Finally, the court refused to review the program for "its effectiveness and wisdom" because the court "ha[d] no way of knowing whether the Program's enhanced monitoring of aliens ha[d] disrupted or deterred attacks.  In any event,

17

such a consideration [was] irrelevant because an *ex ante* rather than *ex post*

assessment of the Program [was] required under the rational basis test." *Id.* The

Second Circuit thus unanimously rejected the petitioners' constitutional challenges

and "join[ed] every circuit that ha[d] considered the issue in concluding that the

Program [did] not violate Equal Protection guarantees." *Id.*; *see Malik v. Gonzales*,

213 F. App'x 173, 174–75 (4th Cir. 2007); *Kandamar v. Gonzales*, 464 F.3d 65,

72–74 (1st Cir. 2006); *Zafar v. U.S. Attorney Gen.*, 461 F.3d 1357, 1367 (11th Cir.

2006); *Hadayat v. Gonzales*, 458 F.3d 659, 664–65 (7th Cir. 2006); *Shaybob v.*

*Attorney Gen.*, 189 F. App'x 127, 130 (3d Cir. 2006); *Ahmed v. Gonzales*, 447

F.3d 433, 439 (5th Cir. 2006); *see also Adenwala v. Holder*, 341 F. App'x 307, 309

(9th Cir. 2009); *Roudnahal v. Ridge*, 310 F. Supp. 2d 884, 892 (N.D. Ohio 2003).

The panel was oblivious to this important history.

The combination of *Mandel*, *Fiallo*, and *Din*, and the history of their

application to the post-9/11 registration program, is devastating to the panel's

conclusion that we can simply apply ordinary constitutional standards to

immigration policy. Compounding its omission, the panel missed all of our own

cases applying *Mandel* to constitutional challenges to immigration decisions. *See*,

*e.g.*, *Cardenas*, 826 F.3d at 1171 (discussing *Mandel* and *Din* extensively as the

"standard of judicial review applicable to the visa denial" where petitioner alleged

18

due process and equal protection violations); *An Na Peng v. Holder*, 673 F.3d 1248, 1258 (9th Cir. 2012) (applying the *Mandel* standard to reject a lawful permanent resident's equal protection challenge against a broad policy); *Bustamante*, 531 F.3d at 1060 (applying *Mandel* to a due process claim and describing *Mandel* as "a highly constrained review"); *Padilla-Padilla v. Gonzales*, 463 F.3d 972, 978–79 (9th Cir. 2006) (applying *Mandel* to a due process challenge to the Illegal Immigration Reform and Immigrant Responsibility Act of 1996); *Nadarajah v. Gonzales*, 443 F.3d 1069, 1082 (9th Cir. 2006) (using the *Mandel* standard to address an alien's challenge to the executive's denial of parole to temporarily enter the United States, and finding the executive's reasons "were not facially legitimate and bona fide"); *Barthelemy v. Ashcroft*, 329 F.3d 1062, 1065 (9th Cir. 2003) (applying *Fiallo* to a facial equal protection challenge based on "former marital status"); *Noh v. INS*, 248 F.3d 938, 942 (9th Cir. 2001) (applying *Mandel* when an alien challenged the revocation of his visa); *see also Andrade-Garcia v. Lynch*, 828 F.3d 829, 834–35 (9th Cir. 2016) (discussing review under *Mandel*). Like the Second Circuit in *Rajah*, we too have repeatedly "equated [the *Mandel*] standard of review with rational basis review." *Barthelemy*, 329 F.3d at 1065; *see An Na Peng*, 673 F.3d at 1258; *Ablang v. Reno*, 52 F.3d 801, 805 (9th Cir. 1995). It is equally clear from our cases that we apply *Mandel* whether we are

19

dealing with an individual determination by the Attorney General or a consular

officer, as in *Mandel* and *Din*, or with broad policy determinations, as in *Fiallo*.

The panel's clear misstatement of law justifies vacating the opinion.

B

Applying *Mandel* here, the panel's error becomes obvious: the Executive

Order was easily "facially legitimate" and supported by a "bona fide reason." As I

have quoted above, § 1182(f) authorizes the President to suspend the entry of "any

class of aliens" as he deems appropriate:

> Whenever the President finds that the entry of any aliens or of any
> class of aliens into the United States would be detrimental to the
> interests of the United States, he may by proclamation, and for such
> period as he shall deem necessary, suspend the entry of all aliens or
> any class of aliens as immigrants or nonimmigrants, or impose on the
> entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).[8] Invoking this authority and making the requisite findings, the

President "proclaim[ed] that the immigrant and nonimmigrant entry into the United

States of aliens from [seven] countries . . . would be detrimental to the interests of

---

[8] Regrettably, the panel never once mentioned § 1182(f), nor did it acknowledge that when acting pursuant it to it, the government's "authority is at its maximum, for it includes all that [the President] possesses in his own right plus all the Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring); *see Knauff*, 338 U.S. at 542 ("When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.").

the United States," and he suspended their entry for 90 days. Exec. Order No. 13769 § 3(c). As the Executive Order further noted, the seven countries—Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—had all been previously identified by either Congress, the Secretary of State, or the Secretary of Homeland Security (all in prior administrations) as "countries or areas of concern" because of terrorist activity.[9] The President noted that we "must be vigilant" in light of "deteriorating conditions in certain countries due to war, strife, disaster, and civil unrest." *Id.* § 1. The President's actions might have been more aggressive than those of his predecessors, but that was his prerogative. Thus, the President's actions were supported by a "facially legitimate and bona fide" reason.

Justice Kennedy indicated in *Din* that it might have been appropriate to "look behind" the government's exclusion of Din's husband if there were "an affirmative showing of bad faith on the part of the consular officer who denied [the

---

[9] *Iraq and Syria*: Congress has disqualified nationals or persons who have been present in Iraq and Syria from eligibility for the Visas Waiver Program. 8 U.S.C. § 1187(a)(12)(A)(i)(I), (ii)(I).

*Iran, Sudan, and Syria*: Under § 1187(a)(12)(A)(i)(II), (ii)(II), the Secretary of State has designated Iran, Sudan, and Syria as state sponsors of terrorism because the "government . . . repeatedly provided support of acts of international terrorism."

*Libya, Somalia, and Yemen*: Similarly, under § 1187(a)(12)(A)(i)(III), (ii)(III), the Secretary of Homeland Security has designated Libya, Somalia, and Yemen as countries where a foreign terrorist organization has a significant presence in the country or where the country is a safe haven for terrorists.

21

husband's] visa." *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment). Because the panel never discussed *Din*, let alone claimed that Justice Kennedy's comment might allow us to peek behind the facial legitimacy of the Executive Order, I need not address the argument in detail. Suffice it to say, it would be a huge leap to suggest that *Din*'s "bad faith" exception also applies to the motives of broad-policy makers as opposed to those of consular officers.

Even if we have questions about the basis for the President's ultimate findings—whether it was a "Muslim ban" or something else—we do not get to peek behind the curtain. So long as there is *one* "facially legitimate and bona fide" reason for the President's actions, our inquiry is at an end. As the Court explained in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999):

> The Executive should not have to disclose its "real" reasons for deeming nationals of a particular country a special threat—or indeed for simply wishing to antagonize a particular foreign country by focusing on that country's nationals—and even it if did disclose them a court would be ill equipped to determine their authenticity and utterly unable to assess their adequacy.

*Id.* at 491; *see Mezei*, 345 U.S. at 210–12; *Knauff*, 338 U.S. at 543.

The panel faulted the government for not coming forward in support of the Executive Order with evidence—including "classified information." *Washington*, 847 F.3d at 1168 & nn.7–8. First, that is precisely what the Court has told us we

22

should not do.  Once the facial legitimacy is established, we may not "look behind the exercise of that discretion."  *Fiallo*, 430 U.S. at 795–96 (quoting *Mandel*, 408 U.S. at 770).  The government may provide more details "when it sees fit" or if Congress "requir[es] it to do so," but we may not require it.  *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in the judgment).  Second, that we have the capacity to hold the confidences of the executive's secrets does not give us the right to examine them, even under the most careful conditions.  As Justice Kennedy wrote in *Din*, "in light of the national security concerns the terrorism bar addresses[,] . . . even if . . . sensitive facts could be reviewed by courts *in camera*, the dangers and difficulties of handling such delicate security material further counsel against requiring disclosure."  *Id.*; *see Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("It would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret.  Nor can courts sit in camera in order to be taken into executive confidences.").  When we apply the correct standard of review, the President does not have to come forward with supporting documentation to explain the basis for the Executive Order.

The panel's errors are many and obvious.  Had it applied the proper standard, the panel should have stopped here and issued the stay of the district

court's TRO. Instead, the panel opinion stands contrary to well-established separation-of-powers principles. We have honored those principles in our prior decisions; the panel failed to observe them here. If for no other reason, we should have gone *en banc* to vacate the panel's opinion in order to keep our own decisions straight.

## III

We are all acutely aware of the enormous controversy and chaos that attended the issuance of the Executive Order. People contested the extent of the national security interests at stake, and they debated the value that the Executive Order added to our security against the real suffering of potential emigres. As tempting as it is to use the judicial power to balance those competing interests as we see fit, we cannot let our personal inclinations get ahead of important, overarching principles about who gets to make decisions in our democracy. For better or worse, every four years we hold a contested presidential election. We have all found ourselves disappointed with the election results in one election cycle or another. But it is the best of American traditions that we also understand and respect the consequences of our elections. Even when we disagree with the judgment of the political branches—and perhaps *especially* when we disagree—we have to trust that the wisdom of the nation as a whole will prevail in the end.

Above all, in a democracy, we have the duty to preserve the liberty of the people by keeping the enormous powers of the national government separated. We are judges, not Platonic Guardians. It is our duty to say what the law is, and the meta-source of our law, the U.S. Constitution, commits the power to make foreign policy, including the decisions to permit or forbid entry into the United States, to the President and Congress. We will yet regret not having taken this case *en banc* to keep those lines of authority straight.

Finally, I wish to comment on the public discourse that has surrounded these proceedings. The panel addressed the government's request for a stay under the worst conditions imaginable, including extraordinarily compressed briefing and argument schedules and the most intense public scrutiny of our court that I can remember. Even as I dissent from our decision not to vacate the panel's flawed opinion, I have the greatest respect for my colleagues. The personal attacks on the distinguished district judge and our colleagues were out of all bounds of civic and persuasive discourse—particularly when they came from the parties. It does no credit to the arguments of the parties to impugn the motives or the competence of the members of this court; *ad hominem* attacks are not a substitute for effective advocacy. Such personal attacks treat the court as though it were merely a political forum in which bargaining, compromise, and even intimidation are acceptable

principles. The courts of law must be more than that, or we are not governed by law at all.

I dissent, respectfully.



*Washington v. Trump*, No. 17-35105

BEA, Circuit Judge, with whom KOZINSKI, CALLAHAN, and IKUTA, Circuit Judges, join, dissenting from the denial of rehearing en banc:

I join Judge Bybee's excellent dissent from the denial of rehearing en banc. I write separately to emphasize a serious error in the panel's conclusion that the due process claims advanced by Washington and Minnesota (collectively, "the States") were likely to succeed on the merits. States may not sue the federal government to assert due process rights for themselves, nor for their residents—much less non-resident aliens—under the Fifth Amendment, because the States are not proper party plaintiffs.[1] We should have taken this case en banc to correct this error in the panel's due process holding and the several errors identified by Judge Bybee in his dissent.

The States are not proper party plaintiffs to make claims under the Due Process Clause, because they are simply not "persons" protected by the Fifth Amendment.[2] *See South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966)

---

[1] The panel denied the government's motion for a stay solely on due process grounds. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). It specifically avoided deciding the First Amendment claim based on religious discrimination.

[2] I agree with the panel that the States have alleged proprietary harms to their public universities sufficient to establish Article III standing. The universities have spent money for procurement of visas for scholars, faculty, and students, which expenditures will be wasted if the visa holders are prevented from attendance at the state schools. What the States have not done, however, is establish that they have rights under the Due Process Clause of the Fifth Amendment to vindicate those proprietary harms.

1

("The word 'person' in the context of the Due Process Clause of the Fifth

Amendment cannot, by any reasonable mode of interpretation, be expanded to

encompass the States of the Union, and to our knowledge this has never been done

by any court.");[3] *United States v. Thoms*, 684 F.3d 893, 899 n.4 (9th Cir. 2012)

(quoting *Katzenbach*, 383 U.S. at 323); *Premo v. Martin*, 119 F.3d 764, 771 (9th

Cir. 1997) ("Because the State is not a 'person' for the purposes of the Fifth

Amendment, the State's reliance on the Due Process Clause was misplaced."

(citing *Katzenbach*, 383 U.S. at 323–24)).

Perhaps to avoid this pitfall, the panel goes one step further. It holds that,

"[u]nder the 'third party standing' doctrine, [the] injuries to the state universities

give the States standing to assert the rights of the students, scholars, and faculty

affected by the Executive Order." *Washington*, 847 F.3d at 1160. In taking this

step, the panel ignores direct, on-point Supreme Court precedent to the contrary.

---

[3] In *Katzenbach*, South Carolina sought "a declaration that selected provisions of the Voting Rights Act of 1965 violate the Federal Constitution," and "an injunction against enforcement of [those] provisions by the Attorney General." *Katzenbach*, 383 U.S. at 307. South Carolina filed its case directly in the Supreme Court, which had original jurisdiction to hear the case. *Id.* The Court denied South Carolina's request to enjoin the enforcement of the Voting Rights Act. In its response to South Carolina's claim that the Voting Rights Act denied South Carolina due process, the Court held that states may not bring due process claims under the Fifth Amendment because states are not persons protected by the Fifth Amendment. *Id.* at 323–24.

2

The States may not sue the federal government as *parens patriae* to protect their citizens from constitutional violations alleged to have been committed by the federal government. *See Katzenbach*, 383 U.S. at 324 ("Nor does a State have standing as the parent of its citizens to invoke these constitutional provisions against the Federal Government, the ultimate *parens patriae* of every American citizen."); *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923) ("While the state, under some circumstances, may sue in that capacity for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as parens patriae, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status." (citing *Missouri v. Illinois*, 180 U.S. 208, 241 (1901))); *see also* Erwin Chemerinsky, *Federal Jurisdiction* 123 (7th ed. 2016) ("One important limit on parens patriae standing of state and local governments is that they may not sue the federal government in this capacity, though they may sue the federal government to protect their own sovereign or proprietary interests.").

The panel avoids this precedent, and holds that the States may sue the federal government on behalf of their residents' (and potential future residents')[4] constitutional interests under the Fifth Amendment because the States have third-party standing to do so.[5] None of the precedent cited by the panel supports its

---

[4] The panel holds that the States may assert "potential claims regarding possible due process rights of other persons," including "[visa] applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Washington*, 847 F.3d at 1166. The Supreme Court has already explained that the States have no rights of their own to assert under the Fifth Amendment, and have no basis for asserting the Fifth Amendment due process rights of their residents. In light of that precedent, I see no reason why the States would be permitted to assert due process claims on behalf of foreign individuals who have not yet received a visa, and who do not yet reside in the States that wish to assert claims on the individuals' behalves. The panel also does not explain what procedures as to notice (reason for denial) or due process hearing (proof of reasons) the federal government would need to provide non-resident visa applicants to satisfy due process upon the denial or suspension of entry pursuant to 8 U.S.C. § 1182(f). Suppose, for example, an Iranian national applies for a non-immigrant tourist visa on April 1, and hostilities break out between the United States and Iran on April 10, one day before the Iranian national expected to receive a visa. Is the Iranian national entitled to notice that his visa will not be issued because of the outbreak of hostilities and to a hearing to justify that the government's denial does not violate the Iranian national's due process rights? Before whom would that hearing be held, where would it take place, and what would be the required proof? Could the Iranian national file suit in a federal district court to assert his "possible" due process rights? The panel invites litigation by visa applicants and other non-resident foreign nationals to assert "potential claims regarding possible due process rights." *Id.* But, as Judge Bybee shows with precision, no alien has a right to enter the United States; it is a privilege which can be withheld. *See Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

[5] The States did not raise third-party standing as a basis to assert the due process rights of their residents. Instead, the States argued that, as *parens patriae*, they may bring due process claims on behalf of their residents (and potential future

4

assertion—which, by the way, was never advanced by the States in their complaint, their response to the federal government's emergency motion, or during oral argument—that a state can evade the strictures of *Katzenbach* and *Mellon* through

residents), citing *Mellon*, 262 U.S. at 481–82, 485 (1923), *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 609 (1982), and *Massachusetts v. EPA*, 549 U.S. 497, 516–21, 520 n.17 (2007). Not so. Although *Mellon* cites *Missouri v. Holland*, 252 U.S. 416 (1920), for the proposition that a state may sue the federal government to protect *its own* quasi-sovereign interests, such as the right of a state to regulate the taking of wild game within its borders, *Mellon*, 262 U.S. at 482, *Mellon* also made clear that "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Id.* at 485–86. In *Snapp*, Puerto Rico sued private individuals and companies engaged in the apple industry in Virginia, alleging that those individuals and companies violated federal statutes when they allegedly discriminated against qualified Puerto Rican farmworkers. The Fourth Circuit held that Puerto Rico, as *parens patriae*, could maintain its suit against the private defendants. The Supreme Court affirmed, and held that Puerto Rico could sue "to secure the federally created interests of its residents *against private defendants*," but also noted that states lack "standing as *parens patriae* to bring an action against the Federal Government." *Snapp*, 458 U.S. 592, 610 n.16 (emphasis added). Finally, in *Massachusetts v. EPA*, the Supreme Court held that Massachusetts alleged facts sufficient to establish standing—not to assert constitutional rights on behalf of its residents, but to assert a statutory right on behalf of the state's own quasi-sovereign interests—to sue the Environmental Protection Agency (EPA). *Massachusetts*, 549 U.S. at 517–21. The Court held that the state was entitled to "special solicitude" in the standing analysis because Congress accorded the states a procedural right to challenge agency action unlawfully withheld, and because the state owned much of the territory alleged to be affected by the EPA's withholding of agency action. *Id.* at 520. Here, neither the States nor the panel cite any congressional authorization for the States to bring their claims. None of the cases cited by the States or the panel supports a theory that a state, as *parens patriae*, may sue the federal government to assert the due process rights of its residents. The panel's uninvited leap to third-party standing completely avoids the precedents actually cited by the States, which more directly address the question whether states can sue the federal government to assert constitutional claims on behalf of their residents. The answer to that question is "No."

5

third-party standing doctrine. A closer look at third-party standing doctrine reveals just the opposite. *See Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) ("[T]here may be circumstances where it is necessary to grant a third party standing to assert the rights of another. But we have limited this exception by requiring a party seeking third-party standing make two additional showings. First, we have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right. Second, we have considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Even if we assume a close relationship between the States' universities and their students, faculty, and scholars, the panel—and more importantly, the States—have not identified any hindrance to first parties' "ability to protect [their] own interests" here. *Id.*; *see also Louhghalam v. Trump*, ___ F. Supp. 3d ___, 2017 WL 479779 (D. Mass. Feb. 3, 2017) (reviewing constitutional claims arising from Executive Order 13769 brought by Iranian nationals who are employed as Associate Professors at the University of Massachusetts–Dartmouth). The panel's conclusion that the States may assert the due process rights of their residents (or potential future residents) under third-party standing doctrine renders *Katzenbach* and *Mellon* meaningless.

To the lay person, our discussion of third-party standing doctrine may seem pedantic and without recognition of the harm that could have resulted from the

6

grant of the federal government's motion to stay the temporary restraining order pending appeal. The important point is this: The States may not sue the federal government, either on their own behalf or on behalf of their citizens, to protect their residents' due process rights under the Fifth Amendment. Much less do the States have third-party standing as to non-resident aliens seeking entry into the country. Therefore, the panel erred when it concluded that the federal government did not establish a likelihood of success on the merits of the States' due process claims—the only claims fully addressed by the panel.

As the district court stated, but unfortunately failed adequately to apply in his temporary restraining order, "The work of the court is not to create policy or judge the wisdom of any particular policy promoted by the other two branches. That is the work of the legislative and executive branches and of the citizens of this country who ultimately exercise democratic control over those branches. The work of the Judiciary, and this court, is limited to ensuring that the actions taken by the other two branches comport with our country's laws, and more importantly, our Constitution." *Washington v. Trump*, No. C17-0141-JLR, 2017 WL 462040, at \*3 (W.D. Wash. Feb. 3, 2017). At a minimum, the federal government established a likelihood of success on the merits that Executive Order 13769 comports with our country's laws and our Constitution. The government's motion for a stay of the temporary restraining order should have been granted. Our court should have

avoided the inclination to rule based on the political headwinds of a particular moment in history and taken this case en banc to correct the panel's significant errors.